**F I L E D**
**Tenth Circuit**

PUBLISH

**FEB 27 2001**

UNITED STATES COURT OF APPEALS

**PATRICK FISHER**
**Clerk**

TENNTH CIRCUIT

SAC AND FOX NATION OF
MISSOURI; IOWA TRIBE OF
KANSAS AND NEBRASKA; PRAIRIE
BAND OF POTAWATOMI INDIANS;
BILL GRAVES, Governor of State of
Kansas,

    Plaintiffs-Appellants,

      v.

No. 00-3063

GALE A. NORTON,[1] Secretary of the
Interior; WYANDOTTE TRIBE OF
OKLAHOMA,

    Defendants-Appellees.

Appeal from United States District Court
for the District of Kansas
(D.C. No. 96-CV-4129)

John R. Shordike, Alexander & Karshmer, Berkeley, California, for the appellant
Sac and Fox Nation of Missouri (Thomas Weathers, Alexander & Karshmer, for
the appellant Sac and Fox Nation of Missouri; Stephen D. McGiffert and Mark S.
Gunnison, Payne & Jones, Chartered, Overland Park, Kansas, for the appellants
Sac and Fox Nation of Missouri and Iowa Tribe of Kansas and Nebraska; M.J.
Willoughby, Assistant Attorney General, Topeka, Kansas, for the appellant Bill

---

[1] Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton is substituted for
Bruce Babbitt, Secretary of the Interior, as a defendant in this action.

Graves; Mason D. Morisset and M. Frances Ayer, Morisset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for the appellant Prairie Band of Potawatomi Indians, with him on the brief).

Jeffrey C. Dobbins, Department of Justice, Washington, D.C. (Lois J. Schiffer, Assistant Attorney General; Jackie N. Williams, United States Attorney; Jackie Rapstine, Assistant United States Attorney; David C. Shilton, Department of Justice; John Jasper, of counsel, with him on the brief), for the appellee Bruce Babbitt.

David McCullough (Michael Minis and Michael McMahan, with him on the brief), Michael Minis & Associates, P.C., Oklahoma City, Oklahoma, for the appellee Wyandotte Tribe of Oklahoma.

---

Before **HENRY**, **BRISCOE**, Circuit Judges, and **JENKINS**, District Judge.[2]

---

**BRISCOE**, Circuit Judge

---

Plaintiffs Sac and Fox Nation of Missouri, Iowa Tribe of Kansas and Nebraska, Prairie Band of Potawatomi Indians, and Bill Graves, the Governor of the State of Kansas, appeal the district court's dismissal of their action. Plaintiffs sought to prevent the Secretary of the Interior from taking a tract of land in downtown Kansas City, Kansas, into trust on behalf of the Wyandotte Tribe of Oklahoma, and approving gaming activities on that tract of land under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701-19. The district court dismissed the action for failure to join the Wyandotte Tribe as a necessary

---

[2] The Honorable Bruce S. Jenkins, Senior United States District Judge, District of Utah, sitting by designation.

2

and indispensable party. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse the district court's dismissal. With respect to the merits of plaintiffs' actions, which we reach because the district court issued alternative holdings, we conclude (1) Pub. L. 98-602 imposed a nondiscretionary duty on the Secretary to acquire land in trust for the Wyandotte Tribe; (2) the Secretary was not required to comply with the National Environmental Policy Act or the National Historical Preservation Act before acquiring land pursuant to Pub. L. 98-602 because the exercise of the Secretary's duty to acquire the land was nondiscretionary; (3) the Secretary acted arbitrarily in determining that only Pub. L. 98-602 funds were used to acquire the tract of land in downtown Kansas City; and (4) the Secretary erred in approving gaming activities on the acquired tract of land. We remand the case to the district court with directions to enter partial judgment consistent with our holdings and to remand in part to the Secretary for further consideration of whether Pub. L. 98-602 funds were used for the acquisition.

I.

The underlying facts of this case are largely uncontroverted. Between 1795 and 1842, the Wyandotte Tribe [3] (the Wyandottes) ceded much of their territory in southeastern Michigan and northern Ohio to the United States. This

---

[3] According to the record, the spelling of the Tribe's name has changed over the years. In the 1800s, it was spelled "Wyandot."

culminated with the signing of a March 17, 1842, treaty in which the Wyandottes ceded all of their remaining land in Michigan and Ohio in return for certain payments and a promised 148,000-acre reservation west of the Mississippi River. In December 1843, the Wyandottes acquired from the Delaware Nation of Indians thirty-six sections of land (23,040 acres) in Kansas situated at the point of the junction of the Missouri and Kansas Rivers (an area now known as Wyandotte County, Kansas). In 1850, the United States reimbursed the Wyandottes for the purchase of the Kansas land to fulfill its obligation under the 1842 treaty.

In 1855, the Wyandottes entered into another treaty with the United States and agreed to dissolve the tribe, become United States citizens, and cede all of their lands to the United States, which in turn would divide the land among the former members of the tribe. The 1855 treaty contained one relevant exception to the Wyandottes' cession agreement: "The portion now enclosed and used as a public burying-ground, shall be permanently reserved and appropriated for that purpose." [4] Admin. Record at 8. That tract, known as the Huron Cemetery, is the focal point of this litigation.

The 1855 treaty resulted in the splintering of the Wyandottes into two

---

[4] By his opinion dated February 4, 1908, the United States Attorney General concluded the 1855 treaty did not dedicate the land in question to "the general public" for cemetery purposes, but rather "the evident intention" of the Wyandottes was "to continue the use of such grounds solely for the burial of their own dead." 26 Op. Att'y. Gen. 491 (1908).

groups – those who accepted citizenship and those who did not. Those who accepted citizenship and received portions of the ceded land are known as the "Absentee" or "Citizen" Wyandots. [5] The small group (approximately 200) who did not accept citizenship and did not receive any of the ceded land were officially reconstituted by Congress in 1867 as the Wyandotte Tribe. [6] The reconstituted tribe settled in Oklahoma on land that had formerly belonged to the Seneca Indians.

In 1906, Congress approved an act granting authority to the Secretary of the Interior to sell the Huron Cemetery. Act of June 21, 1906, 34 Stat. 348. The sale never occurred, however, and in 1913, Congress repealed the authority to sell. Act of Feb. 13, 1913, 37 Stat. 668. In 1916, Congress appropriated $10,000 for the "preservation and improvement" of the Huron Cemetery "owned by the government of the United States, the use of which was conveyed by treaty to the Wyandotte Tribe of Indians." Act of Sept. 8, 1916, 39 Stat. 844. In 1918, the United States and the City of Kansas City, Kansas, entered into a personal care contract for maintenance of the Huron Cemetery. The contract provided that the City of Kansas City would "forever" maintain and care for the cemetery, furnish

---

[5] These members have retained the original spelling of the tribe's name.

[6] The 1855 treaty specifically afforded individual members of the tribe a limited time to apply for exemption from the provisions of the treaty. Thus, the tribe was never completely extinguished pursuant to the treaty.

police protection in and around the cemetery, and furnish electrical energy free of charge for maintenance of the electric lights inside the Huron Cemetery. See Pls. Br. at 16.

In 1956, consistent with the then-favored policy of promoting assimilation of tribal members, Congress enacted a law providing "for the termination of Federal supervision over the trust and restricted property of the Wyandotte Tribe of Oklahoma and the individual members thereof, and for a termination of Federal services furnished to such Indians because of their status as Indians." Admin. Record at 26 (Pub. L. No. 84-887, 70 Stat. 893 (1956)). In pertinent part, the law directed that the Huron Cemetery be sold by the United States.

> Title to the tract of land in Kansas City, Kansas, that was reserved for a public burying ground under article 2 of the treaty dated January 31, 1855 . . . with the Wyandotte Tribe . . . shall be transferred or sold . . . and the proceeds from any sale of the land may be used to remove and reinter the remains of persons who are buried there, to move any monuments now located on the graves, and to erect at reasonable cost one appropriate monument dedicated to the memory of the departed members of the Wyandotte Tribe.

Id. at 27.

The sale of the Huron Cemetery never occurred. This was due, apparently in part, to litigation filed against the United States by a group of Absentee Wyandots and the City of Kansas City, Kansas. The result, under the language of the 1956 Act, was that the Wyandotte Tribe was never actually terminated. Id. at 29 ("Upon removal of Federal restrictions on the property of the tribe . . . , the

6

Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated."). In 1978, Congress enacted a law reinstating to the Wyandotte Tribe all rights and privileges that it might have lost under the 1956 Act. Pub. L. No. 95-281, 92 Stat 246 (1978) (codified at 25 U.S.C. § 861).

In 1984, Congress enacted legislation providing for the appropriation and distribution of money in satisfaction of judgments awarded to the Wyandottes by the Indian Claims Commission and the Court of Claims. See Pub. L. 98-602, 98 Stat. 3149 (1984). The judgments were compensation for lands in Ohio that the Wyandottes had ceded to the United States in the 1800s.[7] Under the 1984 law, Congress directed that 20% of the allocated funds "be used and distributed in accordance with" a series of directives. Key among the directives, for purposes of this case, was one providing that "[a] sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe." Admin. Record at 77 (98 Stat. 3151).

---

[7] In August 1978, the Indian Claims Commission awarded $561,424.21 to the Wyandotte Tribe. The award represented the Wyandotte Tribe's share of the additional compensation awarded to five tribes which ceded approximately three million acres in north central Ohio pursuant to the Fort Industry Treaty of July 4, 1805. Funds to cover the award were appropriated on October 31, 1978. In January 1979, the United States Court of Claims awarded $2,349,679.60 to the Wyandotte Tribe as additional compensation for approximately two million acres of land in northwestern Ohio ceded under an 1817 and an 1818 treaty. The funds to cover this award were appropriated on March 2, 1979.

In 1988, Congress enacted the IGRA. Generally speaking, the IGRA prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). One exception allows gaming on trust lands acquired by the Secretary after October 17, 1988, if the "lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988." Id. § 2719(a)(1). The general prohibition of gaming on lands acquired by the Secretary in trust can also be avoided if

> the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

Id. § 2719(b)(1)(A). There are also other exceptions that are not relevant here.

Due to its meager financial resources and the dim prospects for gaming on its Oklahoma reservation[8], the Wyandottes began a series of efforts aimed at conducting gaming activities at various sites in Kansas. In the early 1990s, the Wyandottes attempted, unsuccessfully, to have the Secretary take into trust on

---

[8] In In re Sunflower Racing, Inc., 219 B.R. 587, 592 (Bankr. D. Kan. 1998), the bankruptcy court in the District of Kansas noted that the Wyandotte Tribe's "primary income [derived] from small farms and a convenience store on the reservation." The court further noted that "[s]ince the Wyandotte reservation is located near a number of other tribal reservations conducting gaming without great success, reservation gaming is unattractive to the Wyandotte Tribe." Id.

8

behalf of the tribe a parcel of land in Park City, Kansas. In 1994-95, the Wyandottes attempted, again unsuccessfully, to claim they were entitled to receive as "excess property" a former federal courthouse located in downtown Kansas City, Kansas, near the Huron Cemetery.

In April 1995, the Wyandottes authorized their chief to purchase four tracts of land in downtown Kansas City, Kansas, all of which abutted the Huron Cemetery. Included among those tracts was a .52-acre tract referred to by the parties as the "Shriner Tract," upon which stands the former Shrine Temple. The tribal resolutions specifically referenced Pub. L. 98-602 (the law providing for the use of $100,000 in allocated funds to purchase land for the Wyandottes), and provided that the purchase of the property would use funds distributed to the Wyandottes under section 105(b)(1) of the statute. The resolution also announced the Wyandottes' intent to conduct gaming on the property after its acquisition.

On January 29, 1996, the Wyandottes filed with the Secretary a Fee-to-Trust Land Acquisition Application for the four tracts of land. The application indicated that the Wyandottes planned "to develop and operate a 50,000 square foot Class II and Class III gaming facility" on the land. Admin. Record at 96. On February 13, 1996, the Associate Solicitor for the Division of Indian Affairs at the Department of Interior issued an opinion that the provisions of Pub. L. 98-602 mandated the Secretary to acquire the tracts of land in trust on behalf of the

Wyandottes. Aplt. App. at 462. This opinion further concluded that, because the acquisition was mandated and thus non-discretionary, neither the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 et seq., nor the provisions of the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 et seq., applied. Finally, the opinion concluded that the Huron Cemetery was a "reservation" for purposes of IGRA, and that the Wyandottes could conduct gaming on the property pursuant to 25 U.S.C. § 2719(a)(1), as long as they met the other applicable requirements of IGRA. The Associate Solicitor subsequently reaffirmed these conclusions in response to an inquiry from the Director of the Indian Gaming Management Staff for the BIA and challenges by the plaintiffs. In doing so, he emphasized that any future actions regarding the acquired property would require compliance with the NEPA and the NHPA.

In mid-April 1996, the Wyandottes narrowed the scope of their acquisition request to the Shriner Tract. It is unclear from the record precisely why they did so. After reviewing the Associate Solicitor's opinions, the Director of the Indian Gaming Management Staff for the BIA recommended to the Assistant Secretary for Indian Affairs that the Shriner Tract be taken into trust for the Wyandottes. The Assistant Secretary concurred in the recommendation and directed the BIA Area Director for the Muskogee Area Office to take action. On June 12, 1996, pursuant to applicable Department of Interior regulations, the Department of the

10

Interior published in the Federal Register a Notice of Intent to take the Shriner Tract into trust for the benefit of the Wyandottes. See 25 C.F.R. § 151.12(b). The purpose of the notice was to allow interested parties to seek judicial review of the proposed action.

On July 12, 1996, plaintiffs filed this action against the Secretary in federal district court challenging his decision to acquire the Shriner Tract in trust for the Wyandottes and his conclusion that the Wyandottes could lawfully conduct gaming on the acquired property under IGRA. Within hours of filing suit, plaintiffs sought and received a temporary restraining order (TRO) preventing the Secretary from taking the Shriner Tract into trust on behalf of the Wyandottes.

The Wyandottes immediately moved to intervene to challenge the TRO. The Wyandottes also filed a notice of interlocutory appeal seeking to appeal the TRO. On July 15, 1996, this court dissolved the TRO, noting that documents submitted by the Wyandottes indicated that if the contract for sale of the Shriner Tract was not closed that same day, "the right of the Secretary to acquire that property in trust" would expire. Aplt. App. at 57. In order "to preserve the status quo," this court dissolved the TRO "subject to the conditions which constitute the law of this case, that the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved, including standing of all parties, jurisdiction, compliance by the Secretary with all

11

requirements of law, and the ultimate question of whether gaming shall be permitted on the subject land." Id. at 58. Following the issuance of this court's order, the Secretary consummated the proposed transaction by purchasing the Shriner Tract and taking it into trust on behalf of the Wyandottes.

After engaging in limited discovery, plaintiffs filed a motion seeking to reverse the Secretary's taking of the property into trust for the Wyandottes and to obtain a declaratory judgment that the Huron Cemetery was not a "reservation" of the Wyandottes for purposes of IGRA. The district court rejected plaintiffs' motion and dismissed the action. In doing so, the district court concluded that "the Wyandotte Tribe [wa]s a necessary party to th[e] litigation under FED. R. CIV. P. 19(a)," and that "the Wyandotte Tribe [wa]s a sovereign entity capable of asserting sovereign immunity." Aplt. App. at 144. The court also concluded that, even though the Wyandottes voluntarily intervened as a defendant, there had been no clear or unequivocal waiver of sovereign immunity "as to either taking the Shriner Tract into trust or declaring the Huron Cemetery to be 'reservation' land." Id. at 148. Further, the court concluded the Wyandottes were an indispensable party because (1) "[a]ny judgment against the Wyandotte Tribe in its absence would be extremely prejudicial to its land and economic interests," (2) "[a] judgment issued absent the presence of the Wyandotte Tribe would only lead to litigation attacking the judgment, and thus could be considered inadequate," (3)

12

"there may be an alternative venue for tackling the issues of casino gambling on the Shriner Tract and the status of the Huron Cemetery" because the Secretary had "indicated that some statutory considerations may apply to future actions relating to the property" and "the negotiation and approval of gaming compacts remain[ed] to be done." Id. at 149.

The district court issued alternative holdings on the merits of all but one of the issues raised by the plaintiffs. First, the court agreed with the Secretary that he was required by Pub. L. 98-602 to acquire the Shriner Tract in trust for the Wyandottes. Second, the court rejected plaintiffs' assertion that the Secretary acted arbitrarily or capriciously by failing to scrutinize whether Pub. L. 98-602 funds were actually used to purchase the Shriner Tract. The district court noted that the Secretary had accepted the representation of the Wyandottes on this matter and there was evidence in the record reflecting the Tribe's commitment to use Pub. L. 98-602 funds for the purchase. Third, the court rejected plaintiffs' argument that the Secretary acted improperly by acquiring the Shriner Tract without engaging in any NEPA or NHPA analysis. The court concluded that, because the Secretary was performing a nondiscretionary duty by taking the tract into trust for the tribe, neither the NEPA nor the NHPA applied to the decision. Finally, the district court refrained from deciding the question of whether the Huron Cemetery constituted a "reservation" for purposes of IGRA. In doing so,

13

the court stated it was "convinced that the issue c[ould] be determined in another judicial forum under different circumstances which d[id] not require a court to ignore settled case law regarding sovereign immunity and the waiver of sovereign immunity." Id.

## II.

We begin by addressing whether the Wyandotte Tribe is a necessary and indispensable party to this action. "The question of whether an absent party is necessary and/or indispensable is resolved by applying Rule 19 of the Federal Rules of Civil Procedure." Davis v. United States, 192 F.3d 951, 957 (10th Cir. 1999); see Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr., 94 F.3d 1407, 1411 (10th Cir. 1996) (indicating that a court must determine whether the party in question is necessary under Rule 19(a) before proceeding to decide whether the party is indispensable under Rule 19(b)). A district court's Rule 19 determinations are reviewed by this court under an abuse of discretion standard. Id. Any legal conclusions underlying a district court's Rule 19 determinations, however, are reviewed de novo. Id.

Rule 19(a) defines those persons who should be joined as parties to an action (and thus are considered necessary parties to the action):

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already

14

parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).

It appears from the record that the district court based its Rule 19(a) ruling in large part upon assertions from the Wyandotte Tribe and the Secretary that the Wyandotte Tribe was a necessary party to this action.[9]  Aplt. App. at 144.  We conclude that application of Rule 19(a) demonstrates the Wyandotte Tribe is not a necessary party to this action.

The first consideration under Rule 19(a) is whether, in the absence of the Wyandotte Tribe, complete relief could be accorded among the persons already parties to the action.  In our view, the answer is clearly "yes."  Because plaintiffs' action focuses solely on the propriety of the Secretary's determinations, the

---

[9]  We note the Secretary has reversed his position on appeal and now concedes that the Wyandotte Tribe is not a necessary party for purposes of Rule 19(a).  See Gov't Br. at 26 ("In circumstances presented here, we believe (our position in the district court notwithstanding) that Rule 19 does not require dismissal of the challenge to the decision to take this property into trust for the Wyandottes.") and 29 ("After further consideration, we believe that certain aspects of our Rule 19 argument in the district court were incorrect.").  That leaves only the Wyandotte Tribe, which has filed a brief with this court discussing the issues on the merits, to assert that the district court's Rule 19 determination was correct.

15

absence of the Wyandotte Tribe does not prevent the plaintiffs from receiving their requested declaratory relief (i.e., a determination that the Secretary acted arbitrarily and capriciously (a) in taking the Shriner Tract into trust for the Wyandotte Tribe, (b) by failing to conduct an NEPA or NHPA review, (c) by failing to confirm that Pub. L. 98-602 funds were used, and (d) by concluding the Huron Cemetery was a "reservation" for purposes of IGRA). Moreover, we are not persuaded there is a likelihood of further lawsuits "involving essentially the same subject matter." 7 Charles A. Wright et al., Federal Practice and Procedure § 1604 at 45-46 (2d ed. 1986).

The second consideration under Rule 19(a) is whether the Wyandotte Tribe claims an interest relating to the subject of this action and, if so, whether disposition of this action in the Wyandotte Tribe's absence may as a practical matter impair its ability to protect that interest or subject any of the persons already parties to a substantial risk of inconsistent obligations. It is undisputed the Wyandotte Tribe has an economic interest in the outcome of this action. More specifically, the Wyandotte Tribe's ability to conduct gaming activities on the Shriner Tract will survive only if all of the Secretary's determinations regarding the Shriner Tract are upheld. The potential of prejudice to the Wyandotte Tribe's interests is greatly reduced, however, by the presence of the Secretary as a party defendant. As a practical matter, the Secretary's interest in defending his

16

determinations is "virtually identical" to the interests of the Wyandotte Tribe.[10]
See Rishell, 94 F.2d at 1412; see also Washington v. Daley, 173 F.3d 1158, 1167-
68 (9th Cir. 1999) (concluding Indian tribes were not necessary parties to actions
filed by State of Washington against Secretary of Commerce challenging
regulation allocating groundfish catches to tribes, inasmuch as the Secretary and
the tribes had virtually identical interests and the United States could therefore
adequately represent the tribes); 3A James Moore, Moore's Federal Practice ¶
19.07[2.1], at 19-106 (2d ed. 1995) ("the fact that the absent person may be bound
by the judgment does not of itself require his joinder if his interests are fully
represented by parties present").  Further, we are not convinced that the Secretary
(or any other party to this suit) would be subjected to a substantial risk of
multiple or inconsistent obligations in the absence of the Wyandotte Tribe.  As
noted above, nothing in the record indicates the possibility of additional lawsuits
involving this same subject matter.  See Wright, supra, § 1604 at 62 ("The key is
whether the possibility of being subject to multiple obligations is real; an
unsubstantiated or speculative risk will not satisfy the Rule 19(a) criteria.").

   Even assuming, arguendo, the Wyandotte Tribe could be considered a

---

[10]  We also note that, despite their contentions that they are entitled to
sovereign immunity and should be deemed a necessary and indispensable party
under Rule 19, the Wyandottes have been heavily involved in defending this
action and have filed a brief with this court addressing the merits of all the issues
raised by plaintiffs.

17

necessary party under Rule 19(a), we are not persuaded the Wyandotte Tribe is an indispensable party under Rule 19(b). A necessary party can be considered an indispensable party only if, "in equity and good conscience," a court should not allow the action to proceed in the party's absence. Fed. R. Civ. P. 19(b). To make this determination, a court must balance the following four factors set forth in Rule 19(b):

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Applying these factors, we conclude the district court abused its discretion in finding the Wyandotte Tribe was an indispensable party. With respect to the first factor, it is true that the Wyandotte Tribe has an economic interest in proceeding with gaming activities on the Shriner Tract. As previously noted, however, the potential of prejudice to that interest is offset in large part by the fact that the Secretary's interests in defending his decisions are substantially similar, if not virtually identical, to those of the Wyandotte Tribe. Further, we note that the Wyandotte Tribe has filed pleadings at virtually all stages of this litigation and has consistently offered its views regarding why the Secretary's

18

actions were appropriate. Because the potential for prejudice is minimal, "we need not be concerned with the second factor, which addresses the availability of means for lessening or avoiding prejudice." Rishell, 94 F.3d at 1412. With respect to the third factor, a judgment rendered in the Wyandottes' absence would be adequate in our view because, regardless of the presence or absence of the Wyandottes, the claims in this action turn solely on the appropriateness of the Secretary's actions, and the Secretary is clearly capable of defending those actions. Moreover, as noted above, the absence of the Wyandotte Tribe does not prevent the plaintiffs from obtaining the relief requested in their complaint. Finally, and perhaps most important, there does not appear to be any alternative forum in which plaintiffs' claims can be heard. Although it is possible the Secretary might later require NEPA or NHPA compliance in order for the Wyandotte Tribe to take action with respect to the Shriner Tract, the instant action is the only opportunity for plaintiffs to challenge the remainder of the Secretary's determinations. See Kescoli v. Babbitt, 101 F.3d 1304, 1311 (9th Cir. 1996) (noting that a court should be "extra cautious" before dismissing an action pursuant to Rule 19(b) if no alternative forum exists); Rishell, 94 F.3d at 1413 (noting that "[t]he absence of an alternative forum would weigh heavily, if not conclusively against dismissal").

In summary, we conclude the district court erred in characterizing the

Wyandotte Tribe as a necessary and indispensable party and dismissing the plaintiffs' action under Rule 19.

III.

We turn to the merits of plaintiffs' action. Plaintiffs challenge the Secretary's determinations that: (1) acquisition of the Shriner Tract was mandated by Pub. L. 98-602; (2) NEPA and NHPA analyses were unnecessary prior to acquisition of the Shriner Tract; and (3) only Pub. L. 98-602 funds were used to purchase the Shriner Tract. In addition, plaintiffs challenge the Secretary's determination that the Huron Cemetery is a "reservation" for purposes of IGRA.

Plaintiffs' challenges are brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706. Under the APA, we cannot set aside an agency decision unless it fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(D); see Public Lands Council v. Babbitt, 154 F.3d 1160, 1166 (10th Cir. 1998), aff'd 529 U.S. 728 (2000). Although the district court passed upon all but one of the plaintiffs' challenges to the Secretary's decisions, we owe no deference to the district court's decision. Rather, the scope of our review is de novo. Public Lands Council, 154 F.3d at 1166.

Because the agency decisions at issue here involve interpretations of

20

federal statutes, our review is guided by the principles announced in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). The first question "always, is . . . whether Congress has directly spoken to the precise question at issue." Id. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. But if the statute is silent or ambiguous, we are generally required to defer to the agency's interpretation "if it is based on a permissible construction of the statute." Id. at 843. More specifically, if we find "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we must accept the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 843-44. Alternatively, if we do not find an express delegation by Congress, but nevertheless perceive an implicit delegation to the agency on the particular question, we must accept a "reasonable interpretation made by the administrator of [the] agency." Id. at 844.

*Was acquisition of the Shriner Tract mandated by Pub. L. 98-602?*

Plaintiffs contend the Secretary violated the APA by concluding he had a nondiscretionary duty under Pub. L. 98-602 to acquire the Shriner Tract in trust for the Wyandotte Tribe. According to plaintiffs, the Secretary remained obligated "to satisfy the requirements of the trust statute, 25 U.S.C. § 465, and

21

regulations, 25 C.F.R. §§ 151 et seq., and to exercise his discretion as required by law in processing any trust application" filed by Wyandotte Tribe pursuant to Pub. L. 98-602. Pls. Br. at 88.

Generally speaking, the Secretary has broad discretion under the Indian Reorganization Act of 1934 (IRA) (the "trust statute" referred to by plaintiffs), 25 U.S.C. § 465, to decide whether to acquire land in trust on behalf of Indian tribes. That statute authorizes the Secretary, "in his discretion, to acquire . . . any interest in lands . . . , within or without existing reservations, . . . for the purpose of providing land for Indians." Id. When the Secretary acts pursuant to the IRA, title to any such lands is "taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." Id. To assist in deciding which lands to take into trust under the IRA, the Secretary has promulgated regulations (the "trust regulations" referred to by plaintiffs). See 25 C.F.R. §§ 151 et seq. In pertinent part, those regulations set forth a "Land acquisition policy," which provides:

> (a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status: (1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or (2) when the tribe already owns an interest in the land; or (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

25 C.F.R. § 151.3(a).

22

Notwithstanding the IRA and its implementing regulations, the Secretary concluded that his discretion regarding whether to acquire the Shriner Tract on behalf of the Wyandotte Tribe was curtailed by Pub. L. 98-602. The Secretary based his conclusion on Section 105 of Pub. L. 98-602, entitled "DISTRIBUTION TO WYANDOTTE TRIBE OF OKLAHOMA," which provides in pertinent part:

> (b) Twenty percent of the funds allocated to the Wyandotte Tribe of Oklahoma pursuant to section 103(b) shall be used and distributed in accordance with the following general plan:
> (1) A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe.
> * * *
> (c)(1) Except as provided in paragraph 2 and notwithstanding any other provision of law, the approval of the Secretary for any payment or distribution by the Wyandotte Tribe of Oklahoma of any funds described in subsection (b) . . . shall not be required and the Secretary shall have no further trust responsibility for the investment, supervision, administration, or expenditure of such funds.
> (2) The Secretary may take such action as the Secretary may determine to be necessary and appropriate to enforce the requirements of this title.

Admin. Record at 77 (98 Stat. 3151).

In our view, the Secretary's interpretation is easily affirmed under the first test set forth in Chevron, i.e., "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. Although subsection (b)(1) of Section 105 could be construed as ambiguous when examined in isolation, subsection (c)(1) resolves any potential ambiguities by indicating that, "notwithstanding any other provision of law, the approval of the Secretary for any

23

payment . . . by the Wyandotte Tribe . . . of any funds described in subsection (b) . . . shall not be required." See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 371 (1988) (indicating that statutory terms are often "clarified by the remainder of the statutory scheme"). Subsection (c)(1) clearly indicates that the Secretary shall have no discretion in deciding whether to take into trust a parcel of land purchased by the Wyandotte Tribe with Pub. L. 98-602 funds. We therefore agree with the Secretary and the district court that, notwithstanding the provisions of the IRA, Pub. L. 98-602 imposed a nondiscretionary duty on the Secretary.

*Was NEPA or NHPA analysis necessary prior to acquisition of Shriner Tract?*

Plaintiffs contend the Secretary violated the APA by determining it was unnecessary for the agency to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., or the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 et seq., prior to acquiring the Shriner Tract in trust for the Wyandotte Tribe. In response, the Secretary contends analysis under the NEPA and the NHPA is unnecessary due to the mandatory nature of the acquisition. In other words, the Secretary contends, because there was no discretion involved in acquiring the Shriner Tract, NEPA and NHPA analysis would have been pointless.

24

Both the NEPA and the NHPA require federal agency heads to take certain steps prior to engaging in certain actions. The NEPA delineates a procedure for federal agencies to follow when any "major federal action" they propose to undertake could pose potential environmental harms. Somewhat similarly, the NHPA requires federal agency heads to take into account the impact of any "Federal or federally assisted undertaking" on sites listed or eligible for listing in the National Register of Historic Places. See 16 U.S.C. § 470f. The NHPA also requires that the Advisory Council on Historic Preservation be given a reasonable opportunity to comment on such undertakings. Id.

Because Pub. L. 98-602 affords the Secretary no discretion with respect to the Shriner Tract acquisition, we conclude the Secretary reasonably determined that no NEPA or NHPA analysis was required prior to the acquisition. Several circuits have held that NEPA compliance is unnecessary where the agency action at issue involves little or no discretion on the part of the agency. E.g., Sierra Club v. Babbitt, 65 F.3d 1502, 1512 (9th Cir. 1995) (collecting cases demonstrating that nondiscretionary agency action is excused from the operation of NEPA); Sugarloaf Citizens Ass'n v. FERC, 959 F.2d 508, 513 (4th Cir. 1992) ("Other Circuits have held that when an agency has no discretion to consider environmental values implementing a statutory requirement, its actions are ministerial and not subject to NEPA."); Goos v. ICC, 911 F.2d 1283, 1296 (8th

25

Cir. 1990) ("Because the ICC has not been granted any discretion under section 1247(d) to base its issuance of an NITU or CITU on environmental consequences, we agree that it would make little sense to force the ICC to consider factors which cannot affect its decision."); Milo Cmty. Hosp. v. Weinberger, 525 F.2d 144, 147 (1st Cir. 1975) (finding that no EIS was necessary where "consideration of the factors that the appellant has characterized as 'environmental considerations' could not have changed the Secretary's decision").  Although no courts have addressed whether NHPA compliance is necessary in such situations, we are persuaded that a similar rule should apply.  Because of the operational similarity between the two statutes, courts generally treat "major federal actions" under the NEPA as closely analogous to "federal undertakings" under the NHPA.  E.g., Ringsred v. City of Duluth, 828 F.2d 1305, 1309 (8th Cir. 1987).  In sum, because the Secretary exercised no discretion in acquiring the Shriner Tract, he reasonably concluded that NEPA or NHPA analysis would have been pointless, since neither could have had any impact on the acquisition.

*Were Pub. L. 98-602 funds used to purchase the Shriner Tract?*

Plaintiffs contend the Secretary acted arbitrarily and capriciously, and against the clear evidence in the agency record, by accepting without scrutiny the Wyandotte Tribe's representation that the Shriner Tract was purchased with only

26

Pub. L. 98-602 funds. In response, the Secretary contends "[t]here is no reason to believe that the money used to purchase the Shriner tract was anything other than money available under Pub. L. 98-602."[11] Gov't Br. at 41-42.

Although the Secretary attempts to support his contention by citing various documents contained in the administrative record, the documents in fact suggest that nearly half of the funds used to acquire the Shriner Tract were non-Pub. L. 98-602 funds. First, the Secretary points to an April 12, 1995 resolution of the Wyandotte Tribe authorizing the fee-to-trust application. Although it is true the resolution indicates that Pub. L. 98-602 funds will be used for the proposed acquisition, it in fact states that the Tribe "will purchase the Kansas City Tract with a portion of the PL 602 set aside funds." Admin. Record at 82 (emphasis added). The reference at best would indicate part of the monies set aside for tribal use in Pub. L. 98-602 would be used in this purchase. Second, the Secretary cites to an April 19, 1996, letter from the Wyandotte Tribe to BIA in which the Tribe outlines its plan for purchasing the Shriner Tract. Although the

---

[11] Plaintiffs' argument is based upon their assumption that Section 105(b)(1) of Pub. L. 98-602 applies only if funds allocated under that section are used to purchase a particular parcel of real property. In his appellate brief, the Secretary did not dispute this assumption. At oral argument, however, the Secretary attempted to assert that he concluded, prior to the acquisition, that Section 105(b)(1) required only that the majority of funds used for an acquisition were Pub. L. 98-602 funds. This assertion is not borne out by the record, nor by the arguments in the Secretary's brief. We therefore disregard it.

27

letter indicates "the Shriner's land" will be purchased for $100,000 using funds "wired from the [Pub. L. 98-602] trust account maintained by the Mercantile Bank of Joplin, Missouri," the letter goes on to state that "[t]he funds required for closing on the Shriner's building [which the Tribe intended to purchase for $80,000] will be wired from *another tribal account*." Id. at 269 (emphasis added). In other words, the letter seems to suggest that only the land, but not the building, was purchased with Pub. L. 98-602 funds. Another document cited by the Secretary, an internal e-mail message from one BIA employee to another, seems to suggest that at least some agency employees were aware that the Pub. L. 98-602 funds remaining and available to fund this purchase would not cover the entire purchase price of the Shriner Tract.

Based upon these documents, which are not contradicted by any other documents in the record, we conclude the Secretary's determination that only Pub. L. 98-602 funds were being used for the purchase was not supported by substantial evidence in the record. We therefore reverse with directions to the district court to remand the matter to the Secretary for further consideration of this issue.

*Is the Huron Cemetery a "reservation" for purposes of IGRA?*

The final, and indeed critical, issue raised by plaintiffs is whether the

28

Secretary acted arbitrarily or capriciously in concluding that the Huron Cemetery constitutes a "reservation" for purposes of IGRA. The district court did not address the question of whether the Huron Cemetery constitutes a "reservation" for purposes of IGRA. Because the facts relevant to that issue are uncontroverted and the issue thus hinges on a question of statutory interpretation, we have discretion to decide it in the first instance and conclude that doing so is in the interests of judicial economy. E.g., United Food & Commercial Workers Union v. Southwest Ohio Reg'l Transit Auth., 163 F.3d 341 (6th Cir. 1998) ("Although we will generally decline to consider in the first instance issues not considered by the district court, we will make an exception where injustice might otherwise result, or where the issue presents only a question of law."); Travelers Ins. Co. v. Pataki, 63 F.3d 89 (2d Cir. 1995) (concluding that appellate court had discretion to decide in the first instance a question of law not reached by the district court).

Plaintiffs contend the Secretary's determination that the Huron Cemetery is a "reservation" for purposes of IGRA is wrong for several reasons. First, plaintiffs argue that when the land upon which the cemetery now rests was acquired by the Wyandottes from the Delawares, there was never any declaration that it was intended to be the Wyandottes' reservation. Second, plaintiffs argue that nothing in the 1855 Treaty indicates that the United States or the Tribe intended for the cemetery to operate as a reservation. Third, plaintiffs contend

29

that in enacting IGRA, Congress specifically distinguished between "reservation" and "lands held in trust" by the United States for a tribe. According to plaintiffs, Congress clearly intended for the term "reservation" to include only land that is actually used for the residence of tribal members (and, through use of the phrase "the Tribe's reservation," indicated that each Tribe would have only one reservation for purposes of IGRA). Plaintiffs argue that the cemetery does not fall within this definition because it is a free-standing public burial ground, situated more than 200 miles away from the Oklahoma reservation upon which the tribal members actually reside. Fourth, plaintiffs argue that the Wyandotte Tribe has not manifested tribal governmental jurisdiction over the cemetery. Finally, plaintiffs argue that the Secretary's determination is contrary to public policy as expressed in IGRA. For example, plaintiffs contend, Congress intended by way of IGRA to provide "employment on reservation for tribal members, members who may be traditionally plagued by few employment opportunities unless they leave the reservation." Pls. Br. at 59. Here, plaintiffs argue, "a casino located in downtown Kansas City, Kansas provides no on-reservation employment for members of the Wyandotte Tribe . . . , who reside more than 200 miles away and would have to leave the Oklahoma reservation to work in the facility." Id. at 59-60.

In response, the Secretary contends that he construed the term

30

"reservation," as used in IGRA, in a manner consistent with its "usual meaning." According to the Secretary, the phrase originally "referred to any land reserved from an Indian cession to the federal government," Gov't Br. at 52 (citing United States v. Winans, 198 U.S. 371, 378 (1905)), but has since evolved "to include land set aside under federal protection, whether by executive order or otherwise, for the use of tribal Indians, regardless of origin." Id. Under this definition, the Secretary contends, it is enough that the property at issue has been set aside for some purpose by the federal government, and there is no requirement that tribal members actually reside on the property. The Secretary contends the Huron Cemetery "falls squarely within this definition":

> In 1848, the United States approved of, and in 1850, the United States paid for, the Wyandottes' purchase of Kansas property in satisfaction of the United States' 1842 promise to the Tribe that it would reserve Kansas lands for the Tribe. In 1855, the Tribe ceded that land to the United States, but the Treaty specifically excepted the Huron Cemetery from the cession. By expressly and unambiguously reserving the cemetery, the treaty gave it the same status as the whole parcel of land had before the cession and allotment. At the very least, as land reserved from an Indian cession to the federal government, the property would fall within the traditional definition of a "reservation."

Id. at 54 (citations omitted). Finally, the Secretary argues that the status of property as a "reservation" under IGRA "is not altered by the failure of a tribe to assert its jurisdiction over land or the assertion of such jurisdiction by others." Id. at 54-55. Instead, the Secretary argues, "only explicit congressional action

31

can alter a property's reservation status." Id. at 55.

To resolve this issue, we again return to the Chevron framework. Because IGRA does not specifically define the term "reservation," the parties agree, as do we, that Congress has not "directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. Normally, under Chevron, the next step would be to determine whether the Secretary's interpretation is based upon a permissible construction of the statute. Significantly, however, neither the Secretary nor the Department of the Interior in general is charged with administering IGRA. When Congress enacted IGRA, it established the National Indian Gaming Commission (Commission) and charged the Commission with the exclusive regulatory authority for Indian gaming conducted pursuant to IGRA.[12] 25 U.S.C. § 2704. That authority includes "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions" of IGRA. 25 U.S.C. § 2706(b)(10). Presumably, the Commission's authority also includes interpreting any ambiguous phrases or terms contained in IGRA.

Reviewing the record in this case, there is no indication that the

---

[12] Although the Commission is nominally part of the Department of the Interior, the Secretary conceded at oral argument that the Commission functions as an independent entity. In any event, Congress expressly indicated that it was only the Commission that had authority to oversee IGRA. For example, although Congress granted the Secretary interim authority to regulate Indian gaming, that authority was to cease at the point at which the Commission was organized and issued regulations. 25 U.S.C. § 2709.

32

Commission had any involvement in deciding whether the Huron Cemetery constituted a "reservation" for purposes of IGRA. To the contrary, the record indicates that a preliminary determination of the issue was first made by the Associate Solicitor for the Division of Indian Affairs. That determination was reviewed and adopted by the Director of the Indian Gaming Management Staff. Further, there is no indication in the record of any connection between the Indian Gaming Management Staff and the Commission. Finally, the determination was adopted by the Assistant Secretary for Indian Affairs. No documents indicate that the determination was reviewed by the Commission.[13]

Because the Secretary lacked authority to interpret the term "reservation," as used in IGRA, we owe no deference to his interpretation. E.g., Adams Fruit Co. v. Barrett, 494 U.S. 638, 649 (1990) (refusing to defer to Secretary of Labor's interpretation of specific provision of the Migrant and Seasonal Agricultural Worker Protection Act because Congress had not charged the Secretary with overseeing the statute); Passamaquoddy Tribe v. Maine, 75 F.3d 784, 793-94 (1st Cir. 1996) (refusing to grant Chevron deference to Indian Gaming Commission's interpretation of Maine Indian Claims Settlement Act of 1980 because the Secretary of the Interior, and not the Commission, was charged with

---

[13] At oral argument, the Secretary conceded that the Commission had no involvement in the determinations at issue in this case.

33

administering the statute); cf. Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 97 (1983) (refusing to sanction "'unauthorized assumption by an agency of major policy decisions'") (quoting American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318 (1965)).  Instead, we proceed to decide for ourselves the meaning of the term "reservation," as used in IGRA.

"The starting point for our interpretation of a statute is always its language."  Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739 (1989) (citing Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).  Unlike other federal statutes which contain specific definitions of the term "reservation," e.g., 7 U.S.C. § 2012 (1994) (defining "reservation" as "the geographically defined area or areas over which a tribal organization . . . exercises governmental jurisdiction"); 25 U.S.C. § 1452(d) (1994) (defining "reservation" to include "Indian reservations, public domain Indian allotments, former Indian reservations in Oklahoma, and land held by incorporated Native groups, regional corporations, and village corporations under the provisions of the Alaska Native Claims Settlement Act"), neither the specific statute at issue here, nor IGRA in general, defines the term "reservation."  We therefore must infer, at least initially, that Congress intended "'to incorporate the established meaning of the[] term[].'"  Reid, 490 U.S. at 739 (quoting NLRB v. Amax Coal Co., 453 U.S. 322, 329 (1981)).

34

The parties disagree on the established meaning of the term "reservation." The Secretary suggests its established meaning broadly refers to any parcel of land set aside by the federal government for Indian use. This position is arguably supported by language found in older Supreme Court cases, e.g., Spalding v. Chandler, 160 U.S. 394, 403 (1896) (indicating that the creation of a reservation confers upon the tribe "the right to possess and occupy the lands for the uses and purposes designated"), as well as by current dictionary definitions of the term. See Black's Law Dictionary 1307 (6th ed. 1990) (defining the term "reservation," in part, as "[a] tract of land (under control of the Bureau of Indian Affairs) to which an American Indian tribe retains its original title to ownership or which has been set aside for its use out of the public domain"). In contrast, plaintiffs argue that the established common-law meaning of the term "reservation," as used in the context of Indian tribes, refers to land set aside by the federal government for the occupation of tribal members. Plaintiffs' position is supported by the leading treatise on Indian law, which indicates that "[t]he term 'Indian reservation' originally had meant any land reserved from an Indian cession to the federal government regardless of the form of tenure." F. Cohen, Handbook of Federal Indian Law at 34 (1982 Edition). The treatise goes on to state: "During the 1850's, the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence of tribal Indians, regardless of

origin. By 1885 this meaning was firmly established in law." Id. at 34-35.[14]

Without deciding which party's view of the established meaning of the term "reservation" is correct, we conclude that the interpretation forwarded by plaintiffs is the one Congress intended to adopt when it enacted IGRA. As noted by plaintiffs, IGRA's use of the phrase "the reservation of the Indian tribe" in 25 U.S.C. § 2719(a)(1), suggests that Congress envisioned that each tribe would have only one reservation for gaming purposes. See generally Bailey v. United States, 516 U.S. 137, 145 (1995) ("We consider not only the bare meaning of the word [at issue] but also its placement and purpose in the statutory scheme."); King v. St. Vincent's Hospital, 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context"). Further, as pointed out by plaintiffs, IGRA specifically distinguishes between the "reservation" of an Indian tribe and lands held in trust for the tribe by the federal government. E.g., 25 U.S.C. § 2719(a)(1)-(2), (b)(1)(B). Under the Secretary's proposed interpretation of the term "reservation," the line between the two would arguably be muddied. In other words, if the term "reservation" were to encompass all land held in trust

---

[14] In his appellate brief, the Secretary cites to a footnote on the same page of this treatise, while omitting the main text of the treatise which is quoted above. Gov't Br. at 52. By doing so, the Secretary omits the key phrase "for the residence of tribal Indians," and attempts to suggest that a "reservation" is land set aside by the federal government for Indian use. This is inconsistent with the treatise's description of the "modern meaning" of the term "Indian reservation."

36

by the government for Indian use (but not necessarily Indian residence), then presumably most, if not all, trust lands would qualify as "reservations." In turn, all of those parcels could be used in the manner in which the Wyandotte Tribe seeks to use the Huron Cemetery and its surrounding tracts.

Applying what we believe to be the proper definition of the term "reservation" for purposes of IGRA to the facts of this case, it is apparent that the Huron Cemetery does not fall within that definition. Although the Huron Cemetery was reserved by the federal government in the 1855 treaty, it is uncontroverted that the reservation was made strictly for purposes of preserving the tract's status as a burial ground.[15] It is further uncontroverted that, since the time of the 1855 treaty, the Huron Cemetery has not been used by the Wyandotte Tribe for purposes of residence. Rather, the tract, which is now separated by a significant distance from the actual reservation of the Wyandotte Tribe in Oklahoma, has consistently maintained its character as a public burial ground.

---

[15] At oral argument, there was some discussion concerning whether the language of the 1855 treaty may have allowed the Wyandotte Tribe to retain title to the Huron Cemetery. We find no support for such a conclusion. If the intent of the 1855 treaty was to allow the Wyandotte Tribe to retain title to the Huron Cemetery, there would have been no need to specify its intended use. In other words, if the Wyandottes had retained title, they could have done with the tract as they wished, and there would have been no need to outline the intended use in the 1855 treaty. In any event, we note the courts and Congress have consistently read the 1855 treaty as transferring title to the Huron Cemetery to the federal government.

37

For these reasons, we conclude the Secretary's determination that the Huron Cemetery is a "reservation" for purposes of IGRA, and his resulting determination that the Shriner Tract can be used by the Wyandotte Tribe for gaming purposes under the IGRA (25 U.S.C. § 2719(a)(1)), was incorrect. As the Secretary correctly points out in his brief, these determinations are separate and distinct from whether he was required by Pub. L. 98-602 to acquire the Shriner Tract. Thus, our disagreement with these determinations of the Secretary does not necessarily negate the acquisition itself.

## IV.

The following is a summary of our holdings. The district court erred in dismissing this action on the grounds that the Wyandotte Tribe was a necessary and indispensable party under Fed. R. Civ. P. 19. We therefore REVERSE the judgment of the district court dismissing this action. With respect to the Secretary's acquisition of the Shriner Tract in trust for the Wyandotte Tribe, we conclude that Pub. L. 98-602 precluded the normal discretion afforded the Secretary by the Indian Reorganization Act regarding land acquisitions. We further agree with the Secretary that, because the acquisition was nondiscretionary, NEPA and NHPA analysis was unnecessary. We conclude, however, that the Secretary's determination that only Pub. L. 98-602 funds were used for the acquisition was not supported by substantial evidence in the record.

Finally, we conclude the Huron Cemetery is not a "reservation" for purposes of IGRA.  We therefore REMAND the case with directions to the district court to enter partial judgment consistent with our holdings, and to REMAND in part to the Secretary for further consideration of the question of whether Pub. L. 98-602 funds were used for the acquisition of the Shriner Tract.