100 N.Y.2d 801 (2003)
798 N.E.2d 1047
766 N.Y.S.2d 654
SARATOGA COUNTY CHAMBER OF COMMERCE, INC., et al., Respondents,
v.
GEORGE PATAKI, as Governor of the State of New York, et al., Appellants. (Action No. 1.)
KEITH L. WRIGHT, as Member of the New York State Assembly, et al., Respondents,
v.
GEORGE E. PATAKI, as Governor of the State of New York, et al., Appellants. (Action No. 2.)
Court of Appeals of the State of New York.
Argued March 26, 2003.
Decided June 12, 2003.
*803 Eliot Spitzer, Attorney General, Albany (Andrew D. Bing, Caitlin J. Halligan, Daniel Smirlock and Peter H. Schiff of counsel), for appellants in the first and second above-entitled actions.
*804 O'Connell and Aronowitz, Albany (Cornelius D. Murray, Jeffrey J. Sherrin, James A. Shannon and Robert T. Fullem of *805 counsel), for respondents in the first above-entitled action.
*806 Jay Goldberg, P.C., New York City (Jay Goldberg and Debra A. Karlstein of counsel), for respondents in the second above-entitled action.
*807 Zuckerman Spaeder LLP, Washington, D.C. (William W. Taylor, III, Elizabeth G. Taylor and Michael R. Smith of counsel), for Oneida Indian Nation, amicus curiae.
Chief Judge KAYE and Judge CIPARICK concur with Judge ROSENBLATT; Judge SMITH concurs in part and dissents in part *846 in a separate opinion, dissenting as to part VIII of Judge ROSENBLATT'S opinion; Judge READ dissents and votes to dismiss the actions in another opinion in which Judges WESLEY and GRAFFEO concur.

*808 OPINION OF THE COURT
ROSENBLATT, J.
On this appeal we address the authority of the Governor to enter into agreements with Indian tribes to permit casino gaming on Indian reservations. Plaintiffs are legislators, organizations and individuals opposed to casino gambling. In challenging the Governor's authority, they contend that by negotiating and signing the agreements without legislative authorization or approval, Governor Mario M. Cuomo in 1993 and Governor George E. Pataki in 1999 violated the principle of separation of powers under the State Constitution (see NY Const, art III, § 1; art IV, § 1).[1] In response, the Governor and the other defendants (collectively, the State) argue that plaintiffs may not bring this action for a variety of procedural reasons and that in any event the agreements were consistent with the separation of powers. After setting forth the background of the case, we address the procedural issues and then turn to the merits.

I. Factual and Statutory Background
On October 15, 1993, then-Governor Cuomo entered into the "Tribal-State Compact Between the St. Regis Mohawk Tribe and the State of New York." The compact, which underlies this appeal, is an outgrowth of the Federal Indian Gaming Regulatory Act (IGRA) (25 USC §§ 2701-2721; 18 USC §§ 1166-1168), and allows the Tribe to conduct gambling, including baccarat, blackjack, craps and roulette, on the Akwesasne Reservation in Franklin County.
In response to the United States Supreme Court's decision in California v Cabazon Band of Mission Indians (480 US 202 [1987]), Congress passed IGRA, which declares that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity" (25 USC § 2701 [5]). IGRA provides statutory *809 authorization for the establishment of Indian casinos, attempts to regulate the gaming so as to avoid "corrupting influences" and seeks to ensure that the Indian tribes are the primary beneficiaries of the gaming (see 25 USC § 2702).
IGRA requires a compact between a tribe and the state before the tribe will be permitted to conduct "Class III" gaming, which includes the Las Vegas-style gaming at issue here.[2] When a tribe requests that a compact be negotiated, a state is required to do so in good faith (see 25 USC § 2710 [d] [3] [A]). The compact should resolve such matters as the applicability of state laws at the casinos, state taxation of gambling revenues, remedies for breach of contract and "any other subjects that are directly related to the operation of gaming activities" (25 USC § 2710 [d] [3] [C] [i]-[vii]). IGRA authorizes compacts only in "State[s] that permit[] such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B]).
According to the terms of the 1993 compact, the New York State Racing and Wagering Board, the New York State Police and the St. Regis Mohawk Tribal Gaming Commission were vested with gaming oversight. Law enforcement responsibilities fell under the cognizance of the State Police, with some law enforcement matters left to the Tribe. As required by IGRA, the compact was approved by the United States Department of the Interior before it took effect.
The Tribe opened its casino on April 10, 1999. On May 27, 1999, Governor Pataki[3] and the Tribe executed an amendment to the 1993 compact. The Interior Department approved the amendment, which allowed the casino to operate electronic class III games, including keno. By its terms, the amendment expired on May 27, 2000, one year after it was signed. Although the Governor and the Tribe later agreed to two additional amendments, the Interior Department disapproved them. As a result, there is no authorization in effect allowing the Tribe to operate electronic gaming. Nevertheless, the parties inform us that electronic gaming continues at the casino.
*810 Shortly after the 1999 amendment took effect, plaintiffs brought suit asserting that the 1993 compact and the 1999 amendment violated the separation of powers and the constitutional gambling prohibition. They sought a declaration that the 1993 compact and the 1999 amendment were unconstitutional, and an injunction prohibiting the State from expending any money in furtherance of the agreements. They also asked the court to enjoin the Governor from taking any further unilateral action (such as signing a successor to the 1999 amendment) that would extend gambling in the state.
By judgment entered March 10, 2000, Supreme Court dismissed the action for plaintiffs' failure to join the Tribe as an indispensable party (see generally CPLR 1001). On appeal, the Appellate Division reversed, concluding that the Tribe was not an indispensable party, noting that a contrary ruling would put Indian gaming compacts beyond constitutional challenge or review (see Saratoga County Chamber of Commerce v Pataki, 275 AD2d 145, 151-154 [2000] [Saratoga I]). While the Appellate Division acknowledged that the Tribe's interests would be affected by the suit, it determined that, on balance, the Tribe's absence should not prevent the suit from going forward. The Court also rejected the State's statute of limitations, standing and laches defenses (see id. at 154-158).
On remand, by order entered April 12, 2001, Supreme Court granted plaintiffs summary judgment. The court declared the 1999 amendment and the 1993 compact void and unenforceable, and enjoined the Governor from taking any further action to reenact an electronic gaming amendment without legislative approval. The Appellate Division affirmed, holding that the Governor's unilateral action deprived the Legislature of its policymaking authority in such areas as "the location of the casino, the gaming that could be carried on there, the extent of state involvement in providing regulation * * * and the fees to be exacted for that regulation" (Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 26 [2002] [Saratoga II]). The State appealed as of right, bringing up for review the substantial constitutional question presented.

II. Mootness
The jurisdiction of this Court extends only to live controversies (see Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608, 72 NY2d 307, 311 [1988]; Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713-714 [1980]). We are thus prohibited from giving advisory opinions or ruling on "academic, hypothetical, *811 moot, or otherwise abstract questions" (Hearst Corp., 50 NY2d at 713). Accordingly, where changed circumstances prevent us "from rendering a decision which would effectually determine an actual controversy between the parties involved," we will dismiss the appeal or reverse the lower court order and direct that court to dismiss the action (Karger, Powers of the New York Court of Appeals § 71 [a], at 426 [3d ed]).

A. 1999 Amendment
Plaintiffs' challenges to the 1999 amendment are moot. The amendment expired in May 2000, and in the intervening three years no similar agreement has gone into effect. A declaration as to the validity or invalidity of the 1999 amendment would therefore have no practical effect on the parties. Granted, a declaration as to the Governor's ability to negotiate amendments to the compact would provide beneficial advice to future officials who will have to make decisions about this casino and other similar projects. This is true, however, of all requests for advisory opinions.
In Hearst we recognized that the mootness prohibition is subject to an exception, by which we have discretion to review a case if the controversy or issue involved is likely to recur, typically evades review, and raises a substantial and novel question (see 50 NY2d at 714-715; see also Wisholek v Douglas, 97 NY2d 740, 742 [2002]). In that event, a court may reach the moot issue even though its decision has no practical effect on the parties (see Hearst, 50 NY2d at 714-715). Plaintiffs here ask us to apply the Hearst mootness exception and address the validity of the 1999 amendment, arguing that the Governor's two unsuccessful attempts to extend the amendment demonstrate a high likelihood of recurrence. They further contend that the one-year length of both the 1999 amendment and the two proposed amendments makes judicial review impracticable.
These are cogent assertions but we are unpersuaded that this controversy is so likely to evade review as to justify our departure from the standard rules of mootness. We are confident that lower courts, if asked by the parties, will expedite consideration of any future agreement, so as to maximize the chances that a judicial resolution will be available during the life of the agreement. More importantly, however, in light of our determination with respect to the 1993 compact (point VII below), there is no reason to believe that the Executive Branch will execute future agreements unilaterally, and therefore the precise issues presented by plaintiffs' *812 challenge to the 1999 amendment may never again recur. Accordingly, we decline to reach that portion of plaintiffs' suit that challenges the validity of the 1999 amendment, and we vacate that portion of the Appellate Division order that declared the 1999 amendment void and unenforceable.
B. 1993 Compact
Plaintiffs' challenge to the 1993 compact undisputedly presents a live controversy. Without a valid Tribal-State compact, IGRA does not permit the operation of a casino.[4] Therefore, a declaration that the 1993 compact violates the State Constitution speaks to the legality of the casino's operation, and thus affects the rights of each party to this suit. Where, as here, a judicial determination carries immediate, practical consequences for the parties, the controversy is not moot (see Matter of Johnson v Pataki, 91 NY2d 214, 222 [1997]).
We now proceed to address plaintiffs' standing.

III. Standing
Standing to sue is critical to the proper functioning of the judicial system. It is a threshold issue. If standing is denied, the pathway to the courthouse is blocked. The plaintiff who has standing, however, may cross the threshold and seek judicial redress. It is difficult to draw an exquisitely sharp line separating the worthy litigant from one who would generate a lawsuit to advance someone else's cause. The rules governing standing help courts separate the tangible from the abstract or speculative injury, and the genuinely aggrieved from the judicial dilettante or amorphous claimant.
For generations, New York courts have treated standing as a common-law concept,[5] requiring that the litigant have something truly at stake in a genuine controversy.[6] We have addressed the issue in a number of contexts, including standing for organizations and associations (see Matter of Aeneas *813 McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d 326 [1998]; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761 [1991]), legislators (see Silver v Pataki, 96 NY2d 532 [2001]), voters (see Matter of Schulz v New York State Exec., 92 NY2d 1 [1998]) and in challenges to administrative actions (see Matter of Colella v Board of Assessors, 95 NY2d 401 [2000]; Rudder v Pataki, 93 NY2d 273 [1999]; Matter of New York Assn. of Convenience Stores v Urbach, 92 NY2d 204 [1998]; Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668 [1996]).
A number of organizations, legislators and citizen-taxpayers are plaintiffs in this action and the State has contested standing as to all of them. Because we conclude that the citizen-taxpayers have standing, it is not necessary to address the State's challenge as to the other plaintiffs (see County of Rensselaer v Regan, 80 NY2d 988, 991 n [1992]).
Unlike other plaintiffs, citizen-taxpayers need not demonstrate an injury-in-fact to acquire standing. Instead, pursuant to State Finance Law § 123-b (1), a citizen-taxpayer may bring suit to prevent the unlawful expenditure of state funds "whether or not such person is or may be affected or specially aggrieved" by the challenged action. We have noted that while the statute might be read to allow actions when little or no injury has been claimed, courts have been inhospitable to plaintiffs who seek essentially to challenge nonfiscal activities by invoking the convenient statutory hook of section 123-b (see Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579, 589 [1998]). Accordingly, we have held that a plaintiff's claims must have a "sufficient nexus to fiscal activities of the State" in order to confer standing (Rudder v Pataki, 93 NY2d at 281). A contrary rule would disrupt government operation by posing the threat of litigation to challenge any governmental action.
The task, of course, is to distinguish between cases that present a challenge to the expenditure of money and those that use the expenditure of money as a pretense to challenge a governmental decision. As we have said, "it is one thing to have standing to correct clear illegality of official action and quite another to have standing in order to interpose litigating plaintiffs and the courts into the management and operation of public enterprises" (Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992 [1976]). Accordingly, a claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing, but a claim that it is illegal *814 to spend money at all for the questioned activity likely would provide the plaintiff with standing. Here, the citizen-taxpayers have sufficiently alleged a challenge to the expenditure of state money to withstand the State's motion to dismiss for lack of standing.
Another reason informs our conclusion. Were we to agree with the State and deny standing as to all plaintiffs in this action, an important constitutional issue would be effectively insulated from judicial review, something we cautioned against in Boryszewski v Brydges (37 NY2d 361, 364 [1975]). Plaintiffs allege that the Governor has acted ultra vires, exceeding the grant of authority that the Constitution gives to the Executive Branch. In separation of powers disputes of this kind, there will ordinarily be few who can claim concrete injury resulting from a breach of the constitutional division of authority. As a party to the 1993 compact but not to this suit, the Tribe signed the agreement and twice sought to extend most terms of the 1999 amendment. The Tribe is therefore an unlikely plaintiff. Others who could be considered harmed by casino gambling may be too remotely affected to gain relief in the courts.
The case before us contrasts sharply with Matter of Colella v Board of Assessors (95 NY2d 401, 410-411 [2000]), where we denied standing, holding that granting it would "permit challenges to the determinations of local governmental officials having no appreciable public significance beyond the immediately affected parties." The issues in the present dispute are fundamental and of immense public significance.
It follows that our doctrines governing standing must be sensitive to claims of institutional harm. Actions of this type can serve as a means for citizens to ensure the continued vitality of the constraints on power that lie at the heart of our constitutional scheme (cf. Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 10 [1975]; Committee for an Effective Judiciary v State, 209 Mont 105, 112-113, 679 P2d 1223, 1227 [1984]; State ex rel. Howard v Oklahoma Corp. Commn., 614 P2d 45, 52 [Okla 1980]). Thus, where a denial of standing would pose "in effect * * * an impenetrable barrier to any judicial scrutiny of legislative action," our duty is to open rather than close the door to the courthouse (see Boryszewski, 37 NY2d at 364; see also State ex rel. Clark v Johnson, 120 NM 562, 904 P2d 11 [1995]; Rios v Symington, 172 Ariz 3, 833 P2d 20 [1992]; State ex rel. Sego v Kirkpatrick, 86 NM 359, 363, 524 P2d 975, 979 [1974]).
*815 Here, the citizen-taxpayer plaintiffs argue that the expenditure of state funds and the use of state regulatory personnel for the casino violate the New York Constitution. If standing doctrine precludes them from bringing this suit, the casino will remain operating indefinitely whether or not the 1993 compact was constitutional. Standing is properly satisfied here, lest procedural hurdles forever foreclose adjudication of the underlying constitutional issue. We next address the statute of limitations argument.

IV. Statute of Limitations
The State claims that this suit should have been brought as a CPLR article 78 proceeding, and that as such, the four-month statute of limitations must be applied and the suit dismissed as time-barred (see e.g. CPLR 217; Solnick v Whalen, 49 NY2d 224, 229-230 [1980]). We disagree because article 78 does not provide plaintiffs a way of obtaining the relief they seek. Where "no other form of proceeding exists for the resolution of the claims tendered in the declaratory judgment action, the six-year limitation of CPLR 213 (subd 1) will then be applicable" (Solnick, 49 NY2d at 230).
Plaintiffs seek a declaration as to the unconstitutionality of the 1993 compact and an injunction against the use of state funds to implement it. That relief cannot be afforded under CPLR article 78. The closest remedy contained in article 78 is prohibition, where an official is proceeding "without or in excess of jurisdiction" (CPLR 7803 [2]). We have held, however, that article 78 may not be used against executive officials, and plaintiffs would therefore have been unable to use article 78 to challenge the Governor's signing of the compact (see Matter of Morgenthau v Erlbaum, 59 NY2d 143, 147 [1983]; Matter of Dondi v Jones, 40 NY2d 8, 13 [1976]; see also Sears v Hull, 192 Ariz 65, 68-69, 961 P2d 1013, 1016-1017 [1998]). Accordingly, the article 78 statute of limitations does not apply. That being so, plaintiffs' declaratory judgment action falls within the residuary six-year statute of limitations period under CPLR 213 (1) (see Vigilant Ins. Co. v Housing Auth., 87 NY2d 36, 42 [1995]; see also Solnick, 49 NY2d at 230; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3001:18, at 446).
The 1993 compact was signed on October 15, 1993, and published in the Federal Register on December 13, 1993. IGRA provides that a compact is not "final" until published in the Federal Register (25 USC § 2710 [d] [1] [A] [iii]; [2] [B]). *816 Plaintiffs filed suit on September 23 and 24, 1999, which fell within the limitations period. A suit brought in compliance with the statute of limitations may nonetheless be barred by laches, so we proceed to address that issue.

V. Laches
Laches and limitations are not the same. Limitations involve the fixed statutory periods within which actions must be brought, while laches signifies a delay independent of statute (see Siegel, NY Prac § 36, at 44 [3d ed 1999]; 2A Carmody-Wait 2d, NY Prac § 13:4, at 94 [2001]). We have defined laches as an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party (see Matter of Barabash, 31 NY2d 76, 81 [1972]; see also Matter of Dreikausen v Zoning Bd. of Appeals, 98 NY2d 165, 173 n 4 [2002]). The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches (see Galyn v Schwartz, 56 NY2d 969, 972 [1982]; Sorrentino v Mierzwa, 25 NY2d 59 [1969]; Skrodelis v Norbergs, 272 AD2d 316 [2d Dept 2000]). The defense has been applied in equitable actions and declaratory judgment actions (both of which are governed by the six-year catchall provision of CPLR 213 [1]) where the defendant shows prejudicial delay even though the limitations period was met.[7]
The State claims that the nearly six-year delay between the effective date of the 1993 compact and the start of this suit has prejudiced the Tribe. The Appellate Division refused to consider the effect of any prejudice to the Tribe, concluding that the State lacked the authority to raise a claim of prejudice on behalf of a nonparty. We conclude that the State has the power to argue that prejudice to a nonparty bars this action, *817 but that in this instance there has been no prejudice to the Tribe warranting dismissal.
In Matter of Schulz v State of New York (81 NY2d 336, 348-350 [1993]), we held that the prejudice caused by sales of bonds between the effective date of a law authorizing those bonds and the institution of the challenge to the law (one year later) was sufficient prejudice to bar the action. The Court held that the impact on the State as well as on the investors, "with whom the State engaged in these multimillion dollar financing transactions," was enough to spell out laches (id. at 348). We thus recognized that harm to economic interests can be enough to bar an action on laches grounds, even if the delay does not affect a defendant's ability to defend against a suit.
Nowhere in the present case, however, is there any indication that the delay in bringing this action has caused the slightest harm to the Tribe. Plaintiffs point out that the Tribe has been operating the casinoand presumably profiting from it during the entire pendency of this suit (cf. Marcus v Village of Mamaroneck, 283 NY 325, 332 [1940] [noting in a zoning dispute that "the delay of plaintiffs has afforded defendants many years of unlawful use"]). While in Schulz the delay could have caused bond investors to lose the opportunity for investments were the bonds to be invalidated, here there is no comparable risk. True enough, had the casino been shut down on its grand opening, the investment would have been lost. But the casino has been operating for four years, and there is nothing on this record to indicate how much money the casino has made during the pendency of this action. Without knowing how much, if anything, the casino stands to loseand having no basis to conclude that it has not profitedwe cannot dismiss a suit on laches grounds for economic prejudice.
Plaintiffs argue that the Tribe was on notice as to the possible illegality of the compact, citing a memorandum from Governor Cuomo's Counsel indicating that the Tribe had been informed that legislative approval would be required before the State could enter into effective compacts.[8] Thus, while the casino is presumably expected to make large sums over the *818 next several years, and while plaintiffs' suit threatens that source of revenue, the prejudice caused by a loss of expected profits based on a predictably vulnerable compact is not the sort of prejudice that supports a defense of laches. Were it otherwise, very few suits would proceed past laches analysis, and certainly no suits seeking to invalidate illegal contracts could ever proceed.
There is another important distinction between Schulz and this case. In Schulz, the State approved a bond program to raise revenue. Investors bought bonds expecting the State to pay back the investment with interest. To maintain fiscal credibility as a borrower, the State must uphold its contracts, particularly when it has borrowed on credit. We recognized that entertaining a suit challenging the authority of the State to issue those bondsparticularly after a year's delaymight hinder the State's ability to raise financing in the future, to say *819 nothing of the effects on budget projections that invalidation of a source of revenue would cause (see Schulz, 81 NY2d at 347-348 [noting "the profound destabilizing and prejudicial effects from delay * * * (that) must be examined for their impact on the State, on the operation and maintenance of orderly government, on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general"]). None of those factors is present here.

VI. The Tribe as an Indispensable Party
The Tribe is not a party to this action. Although its interests are certainly affected by this litigation, the Tribe has chosen not to participate. Unless Congress provides otherwise, Indian tribes possess sovereign immunity against the judicial processes of states (see e.g. Santa Clara Pueblo v Martinez, 436 US 49, 58 [1978]; United States v United States Fid. & Guar. Co., 309 US 506, 512 [1940]; Turner v United States, 248 US 354, 358 [1919]). As a result, New York courts cannot force the Tribe to participate in this lawsuit. The State claims that the Tribe's absence requires us to dismiss this action. We disagree.
CPLR 1001 sets forth the rules governing when joinder of parties is necessary to continue an action affecting the rights of those parties. The statute directs that persons must be brought into the action when joinder is necessary to accord "complete relief" between the parties, or when the interests of the person might be "inequitably affected by a judgment in the action" (CPLR 1001 [a]). Where a person who should be joined nevertheless cannot be joined, courts must decide whether the action can proceed without the "necessary" party. Parties who must be joined lest the action be dismissed are termed "indispensable parties." CPLR 1001 (b) provides five factors for courts to consider in deciding whether to dismiss an action where, as here, "jurisdiction over [the necessary party] can be obtained only by his consent or appearance":
"1. Whether the plaintiff has another effective remedy in case the action is dismissed on account of the nonjoinder;
"2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined;
"3. whether and by whom prejudice might have been avoided or may in the future be avoided;

*820 "4. the feasibility of a protective provision by order of the court or in the judgment; and
"5. whether an effective judgment may be rendered in the absence of the person who is not joined" (CPLR 1001 [b]).
The State relies principally on paragraph (2), and argues that the prejudice to the Tribe caused by a judgment eviscerating the authority under which it operates the casino should be sufficient to dismiss the action. In contrast, plaintiffs rely on paragraph (1), arguing that there can be no remedy for the alleged constitutional violation if the Tribe's absence requires dismissal.
Plaintiffs' arguments are on firmer ground. Not only will these plaintiffs be stripped of a remedy if we hold that the Tribe is an indispensable party, but no member of the public will ever be able to bring this constitutional challenge. In effect, the Executive could sign agreements with any entity beyond the jurisdiction of the Court, free of constitutional interdiction. The Executive's actions would thus be insulated from review, a prospect antithetical to our system of checks and balances.
There are two principal purposes of requiring dismissal owing to the absence of an indispensable party. First, mandatory joinder prevents multiple, inconsistent judgments relating to the same controversy. Second, joinder protects the otherwise absent parties who would be "embarrassed by judgments purporting to bind their rights or interests where they have had no opportunity to be heard" (First Natl. Bank v Shuler, 153 NY 163, 170 [1897]; see generally, 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 1001.01 [2002]).
Neither purpose applies here. The Tribe has chosen to be absent. Nobody has denied it the "opportunity to be heard"; in fact, the Oneida Indian Nation, which operates the Turning Stone Casino, has appeared as amicus curiae making much the same arguments we would expect to be made by the Tribe had it chosen to participate. While sovereign immunity prevents the Tribe from being forced to participate in New York court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe (see Keene v Chambers, 271 NY 326, 330 [1936]; Plaut v HGH Partnership, 59 AD2d 686 [1st Dept 1977]; 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 1001.10 [citing cases]). While we fully respect the sovereign prerogatives of the Indian tribes, we will not permit *821 the Tribe's voluntary absence to deprive these plaintiffs (and in turn any member of the public) of their day in court.
In balancing the CPLR 1001 factors, the Appellate Division concluded that the equities weighed against dismissal. That conclusion was not an abuse of discretion. While in other cases sovereign immunity might support dismissal,[9] here the factors weigh toward allowing judicial review of this constitutional question (see generally Siegel, NY Prac § 133 ["Dismissal of the action for nonjoinder of a given person is a possibility under the CPLR, but it is only a last resort"]).[10]
We conclude that the alleged constitutional violation will be without remedy if this action is dismissed for the Tribe's nonjoinder. We further conclude that to the extent the Tribe is prejudiced by our adjudication of issues that affect its rights under the compact, the Tribe could have mitigated that prejudice by participating in the suit (cf. United States ex rel. Steele v Turn Key Gaming, Inc., 135 F3d 1249, 1252 [8th Cir 1998]). The Tribe's nonjoinder is therefore excused, and we proceed to discuss the merits.

VII. Separation of Powers
Article III of the State Constitution vests the Senate and the Assembly with the legislative power of the State, while article IV vests the executive power in the Governor and article VI vests the court system with the judicial power (see NY Const, art III, § 1; art IV, § 1; art VI, § 1). We have recognized that these "separate grants of power to each of the coordinate branches of government" imply that each branch is to exercise power within a given sphere of authority (Clark v Cuomo, 66 NY2d 185, 189 [1985]). Stated succinctly, the separation of powers "requires that the Legislature make the critical policy *822 decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 NY2d 781, 784 [1995] [citing Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340, 349 (1991)]).
This is not to say that the functions of government can be neatly boxed into judicial, executive and legislative categories. The distinctions are often elusive, and the fluid functioning of government requires that the interactions among the three branches be allowed some "play in its joints" (Bain Peanut Co. of Tex. v Pinson, 282 US 499, 501 [1931]; see also Youngstown Sheet & Tube Co. v Sawyer, 343 US 579, 635 [1952] [Jackson, J., concurring]; Matter of Richardson, 247 NY 401, 410 [1928]).
It thus falls to the courts, and ultimately to this Court, to determine whether a challenged gubernatorial action is "legislative" and therefore ultra vires. In this case we have no difficulty determining that the Governor's actions were policymaking, and thus legislative in character.
Initially, we hold that IGRA does not preempt state law governing which state actors are competent to negotiate and agree to gaming compacts. IGRA imposes on "the State" an obligation to negotiate in good faith (25 USC § 2710 [d] [3] [a]), but identifies no particular state actor who shall negotiate the compacts; that question is left up to state law (see Pueblo of Santa Ana v Kelly, 104 F3d 1546, 1557 [10th Cir 1997], cert denied 522 US 807 [1997]). As the Supreme Court noted, the duty to negotiate imposed by IGRA "is not of the sort likely to be performed by an individual state executive officer or even a group of officers" (Seminole Tribe of Fla. v Florida, 517 US 44, 75 n 17 [1996] [citing State ex rel. Stephan v Finney, 251 Kan 559, 836 P2d 1169 (1992)]).
IGRA itself contemplates that states will confront several policy choices when negotiating gaming compacts (see Yavapai-Prescott Indian Tribe v Arizona, 796 F Supp 1292, 1296-1297 [D Ariz 1992]). Congress provided that potential conflicts may be resolved in the compact itself, explicitly noting the many policies affected by tribal gaming compacts. Indeed, gaming compacts are laden with policy choices, as Congress well recognized.
"Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to 
"(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State *823 that are directly related to, and necessary for, the licensing and regulation of such activity;
"(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
"(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
"(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
"(v) remedies for breach of contract;
"(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
"(vii) any other subjects that are directly related to the operation of gaming activities" (25 USC § 2710 [d] [3] [C]).
Compacts addressing these issues necessarily make fundamental policy choices that epitomize "legislative power." Decisions involving licensing, taxation and criminal and civil jurisdiction require a balancing of differing interests, a task the multimember, representative Legislature is entrusted to perform under our constitutional structure.
Additionally, as noted by Governor's Counsel in 1993, the compacts require the State Racing and Wagering Board to adopt new regulations for carrying out its casino oversight responsibilities. The choice of which agency shall regulate an activity can be as fundamental a policy decision as choosing the substance of those regulations. For that reason, and because agencies are creatures of the Legislature, the Constitution requires that agencies carry out only those duties assigned them by the Legislature expressly or by necessary implication (see Matter of Beer Garden v New York State Liq. Auth., 79 NY2d 266, 276 [1992]). There is no legislative authorization for state agencies to promulgate regulations for the oversight of casino gambling. The compacts therefore have usurped the Legislature's power.
The State argues that by passing certain appropriation bills, the Legislature has signaled its approval of the compact. We disagree. Those enactments are no substitute for approval or *824 total ratification. The Legislature has been free to ratify the compact but, as yet, has not done so. Indeed, the State Assembly in a resolution expressly opposed the Governor's unilateral action in negotiating and signing the compact. The resolution asked the Secretary of the Interior not to approve any compact unless approved by the Legislature. The Assembly stated that "[a]ny compact permitting casino gambling necessarily requires at a minimum the exercise of legislative power with respect to regulatory appropriations and related police powers," and that therefore "[t]he Governor lacks authority to act on behalf of the State to enter into a tribal-state compact" (Assembly Resolution No. 2413 [1996]). This expression does not square with the State's claim that the Legislature has impliedly approved the compact.
Unsurprisingly, every state high court to consider the issue has concluded that the state executive lacks the power unilaterally to negotiate and execute tribal gaming compacts under IGRA.[11] New Mexico, Kansas and Rhode Island have each concluded that gaming compacts incorporate policy choices reserved for the Legislature (see State ex rel. Clark v Johnson, 120 NM 562, 904 P2d 11 [1995]; State ex rel. Stephan v Finney, 251 Kan 559, 836 P2d 1169 [1992]; Narragansett Indian Tribe of R.I. v Rhode Island, 667 A2d 280 [RI 1995]; see also McCartney v Attorney Gen., 231 Mich App 722, 728, 587 NW2d 824, 827 [1998] ["(T)he Governor has the ability to enter into compacts with Indian tribes, subject to the approval of the Legislature"], appeal denied 460 Mich 873, 601 NW2d 101 [1999]). Today we join those states in a commitment to the separation of powers and constitutional government.

VIII. The Constitutional Antigambling Provision
The parties have argued the applicability of the State Constitution's antigambling provision (NY Const, art I, § 9). In light of our disposition of the separation of powers question, it is unnecessary for us to reach that argument, and there are compelling reasons not to do so at this time. Indeed, anything we would say in that regard would be dictum, inasmuch as the separation of powers point is an independent ground for invalidating the compact.
*825 Neither the trial court nor the Appellate Division addressed the antigambling provision, and it is unwise for usas a court of last resortto initiate the discussion. Supreme Court did not discuss the article I, § 9 constitutional issue at all, and the Appellate Division made only a reference to it. Clearly, it is better for this Court not to resolve constitutional questions unaddressed by the lower courts (see Bernstein v Bodean, 53 NY2d 520, 529-530 [1981]; Comiskey v Arlen, 43 NY2d 696, 698 [1977]; see also Schiavone v City of New York, 92 NY2d 308, 317 [1998]).
Judge Read's arguments in favor of the compact's compatibility with article I, § 9, and the contrary views of Judge Smith, strengthen our belief that further development of the issue by the courts below is desirable, if not necessary. Judge Read and Judge Smith debate the applicability of Cabazon to the article I, § 9 issue. While their insights are illuminating, we note that the lower courts did not cite, let alone address, Cabazon or other possibly relevant cases. They did not determine whether the compact could survive an article I, § 9 challenge. The Appellate Division's reference to the provision did not involve the treatment that should precede this Court's review of an issue of that magnitude. The question of the compact's compatibility with the Constitution's antigambling provision is far too important for us to address in this legal vacuum. Furthermore, the parties have informed us that a case pending before the lower courts squarely addresses the question of the applicability of the State Constitution's antigambling provision.
Accordingly, the order of the Appellate Division should be modified, with costs to plaintiffs, by vacating on the ground of mootness so much of the order as affirmed that portion of Supreme Court's order declaring the May 27, 1999 amendment to the 1993 Tribal-State Compact void and unenforceable and, as so modified, affirmed.
SMITH, J. (concurring in part and dissenting in part). I agree with the majority that the 1993 Compact violates the New York State Constitution in that the Legislature and not the Governor is given policymaking authority. In addition, because article I, § 9 of the New York State Constitution clearly forbids the gambling permitted by the 1993 Compact, I would reach that issue.[1]
As noted by the Court's opinion, the New York State Constitution *826 authorizes the Legislature and not the Governor to set policy. It reads: "The legislative power of this state shall be vested in the senate and the assembly" (NY Const, art III, § 1). "The executive power shall be vested in the governor * * *." (NY Const, art IV, § 1.) "The governor shall communicate by message to the legislature at every session the condition of the state, and recommend such matters to it as he or she shall judge expedient. The governor shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed" (NY Const, art IV, § 3).
It is equally true, however, that the Constitution forbids gambling, except for limited exceptions, and prohibits commercialized gambling. It reads:
"[E]xcept as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section" (NY Const, art I, § 9 [1]).
Before the first New York State Constitution was written in 1777, gambling in New York was forbidden. Colonial Governor *827 Tryon was appointed by the King of England in February 1771.[2] He served as Governor until after the Revolution began, leaving office on March 23, 1780. The commission and instructions issued to Tryon upon his appointment prohibited gambling, referred to as "lotteries":
"Whereas, a practice hath of late years prevailed in several of our colonies and plantations in America of passing laws for raising money by constituting public lotteries, and whereas, it hath been represented unto us that such practice doth tend to disengage those who become adventurers therein from that spirit of industry and attention to their proper callings and occupations on which the public welfare so greatly depends, and whereas, it further appears that this practice of authorizing lotteries by acts of legislature hath been also extended to the enabling private persons to set up such lotteries, by means whereof great frauds and abuses have been committed, it is therefore our will and pleasure that you do not give your assent to any act or acts for raising money by the institution of any public or private lotteries whatever until you shall have first transmitted unto us by one of our principal secretaries of state a draught or draughts of such act or acts, and shall have received our direction thereupon."
The original Constitution of 1777 does not mention gambling or lotteries. Lotteries were again specifically prohibited in the second Constitution, approved in 1821. Article VII, § 11 provided: "No lottery shall hereafter be authorized in this state; and the legislature shall pass laws to prevent the sale of all lottery tickets within this state, except in lotteries already provided for by law."
In the third Constitution, approved in 1846, article I, § 10 prohibited gambling in almost identical language to the previous Constitution: "nor shall any lottery hereafter be authorized, or any sale of lottery tickets allowed within this state."
The fourth Constitution, approved in 1894, specifically prohibited gambling in article I, § 9. In addition to prohibiting lotteries and gambling in general, this section singled out pool-selling and bookmaking as well. It read: "nor shall any lottery or the sale of lottery tickets, pool-selling, book-making, or any *828 other kind of gambling hereafter be authorized or allowed within this State."
In 1938 the fifth and current Constitution was approved. This Constitution maintained the general prohibition against gambling but did authorize a limited range of gambling. Article I, § 9 (1) provides:
"except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state."
Article I, § 9 (2) provides:
"any city, town or village within the state may by an approving vote of the majority of the qualified electors * * * voting on a proposition * * * at a general or special election * * *, subject to state legislative supervision and control, * * * conduct * * * the following categories of games of chance * * * (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance."
Subdivision (2) goes on to provide that "only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games."
Additionally, subdivision (2) provides that "[t]he legislature shall pass appropriate laws to effectuate the purposes of this subdivision, [and] ensure that such games are rigidly regulated to prevent commercialized gambling" (emphasis added).
*829 Consistent with this latter provision, the Legislature has outlawed most forms of gambling (see Penal Law art 225). As noted in Donnino's Practice Commentary to article 225, "With certain exceptions, gambling is prohibited by the New York State Constitution [article I, § 9]." (McKinney's Cons Laws of NY, Book 39, at 195.)
The Indian Gaming Regulatory Act (25 USC § 2701 et seq.) does not require that gambling be imposed upon states where it is forbidden. 25 USC § 2701 (5) provides:
"Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity" (emphasis added).[3]
The Indian Gaming Regulatory Act defines three classes of gaming. Class I gaming means "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations" (25 USC § 2703 [6]). Class II gaming is defined in 25 USC § 2703 (7) (A) which provides:
"The term `class II gaming' means 
"(i) the game of chance commonly known as bingo * * *
"(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
"(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
"(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including * * * pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and

*830 "(ii) card games that 
"(I) are explicitly authorized by the laws of the State, or
"(II) are not explicitly prohibited by the laws of the State and are played at any location in the State."
The statute further defines what class II gaming does not include. 25 USC § 2703 (7) (B) provides:
"The term `class II gaming' does not include 
"(i) any banking card games, including baccarat, chemin de fer, or blackjack (21), or
"(ii) electronic or electromechanical facsimiles of any game of chance or slot machines of any kind."
The term class III gaming is defined in 25 USC § 2703 (8) and provides:
"The term `class III gaming' means all forms of gaming that are not class I gaming or class II gaming."
In violation of article I, § 9, the 1993 Compact authorizes class III commercial gaming. The preamble to the 1993 Compact, entitled "Tribal-State Compact Between the St. Regis Mohawk Tribe and the State of New York" refers to class III gaming and states "WHEREAS, the St. Regis Mohawk Tribe and the State of New York have mutually agreed * * * to the following provisions governing the conduct of Class III gaming activities on the lands of the Tribe * * * [to] (b) develop and implement a means of regulation for the conduct of Class III gaming on Indian lands." Section 3 (a) of the Compact refers to appendix A for a list of games to be conducted under the Compact. Included in this list are baccarat and blackjack, two games which are specifically carved out as being class III gaming (see 25 USC § 2703 [7] [B] [i]; [8]). Not only does the 1993 Compact authorize class III gaming, it also involves the State of New York in the investigation and maintenance of the gambling facility. The Tribe is to reimburse the State of New York for its expenses.
The 1999 Amendment to the Compact was equally violative of the New York State Constitution in that it sought to allow computerized versions of class III gaming. The record indicates that despite the expiration of this amendment and the fact that its validity is a moot issue, the gambling authorized by that amendment continues today and is an issue before this Court.
*831 Class III gaming is against public policy and has been since before this State's first Constitution. Moreover, Penal Law § 225.05 provides, "A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity." The Penal Law further defines what constitutes advancing gambling activity:
"A person `advances gambling activity' when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation" (Penal Law § 225.00 [4]).
California v Cabazon Band of Mission Indians (480 US 202 [1987])[4] does not negate the more than 200-year-old New York antigambling policy. First, the case did not involve a state like New York with a clear antigambling policy. In the course of the Cabazon opinion, the Supreme Court stated, "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular" (480 US at 211). Second, no compact between a state and an Indian tribe was involved. The issue was not, as here, whether a compact violated the State Constitution but whether a California statute and county ordinances dealing with bingo and other forms of gambling were criminal or civil for purposes of Public Law 280 (67 US Stat 588, as amended).
A review of the facts in Cabazon makes clear that it is distinguishable from the case before us. The Cabazon and Morongo Bands of Mission Indians occupy reservations in Riverside County, California. Each band conducts bingo games, open to the general public, on their reservations. The Cabazon *832 Band also operates a card club for playing draw poker and other card games, which are open to the public.
California, which permits only charitable organizations to play bingo, sought to enforce an anti-bingo statute (Cal Penal Code § 326.5 [West Supp 1987]). Riverside County sought to enforce an anti-bingo ordinance and ordinances prohibiting draw poker and other card games (Ordinance Nos. 331, 558). The actions of the State and County were taken pursuant to Public Law 280.
The Tribes sued the County in Federal District Court seeking a declaratory judgment that the defendants had no authority to apply its laws inside the reservations and an injunction against their enforcement. The State intervened. The District Court granted the Tribes' motion for summary judgment, holding that neither the State nor the County had any authority to enforce its gambling laws within the reservations. The Court of Appeals affirmed, stating that state laws may be applied to tribal Indians on their reservations if Congress has expressly consented.[5]
Public Law 280 gave California and five other states jurisdiction over specified areas of Indian lands. California was given broad authority to enforce its criminal laws on Indian lands. It was given only limited authority to enforce its civil laws on Indian lands so as not to attempt a total assimilation of Indian tribes, which retain attributes of sovereignty, into American society. The question in this case was whether the antigambling laws were primarily criminal or civil in nature.
The Supreme Court noted that the Court of Appeals distinguished a state's "criminal/prohibitory" laws and state "civil/regulatory" laws as follows: "if the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation" (California v Cabazon Band of Mission Indians, 480 US 202, 209 [1987], citing Barona Group of Capitan Grande Band of Mission Indians v Duffy, 694 F2d 1185 [9th Cir 1982], cert denied 461 US 929 [1983]).
In affirming Cabazon, the United States Supreme Court agreed with this distinction while noting this "is not a bright-line *833 rule" and left room for the argument that the bingo statute is prohibitory rather than regulatory (id. at 210). Thus, the Supreme Court concluded that the California statutes and ordinances regulating gambling were regulatory and civil, and not criminal and prohibitory, for purposes of Public Law 280.
Finally, I agree with the Appellate Division that the commercialized gambling authorized by the 1993 Compact is a clear violation of the New York Constitution.[6] That Court stated:
"Under the circumstances, we conclude that the commercialized Las Vegas style gambling authorized by the compact is the antithesis of the highly restricted and `rigidly regulated' (NY Const, art I, § 9 [2]) forms of gambling permitted by the NY Constitution * * * and New York's established public policy disfavoring gambling." (Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 24 [2002].)
The People of the State of New York have decided in New York's Constitution to prohibit commercial gambling.[7] If the elected representatives of the People want to change that policy, they should begin the process of amending the Constitution.[8]
READ, J. (dissenting).
In late 1993, then Governor Mario M. Cuomo signed a tribal-state compact with the St. Regis Mohawk Tribe to regulate Indian gaming at a casino on Indian lands, an activity sanctioned by a unique interaction between federal sovereignty over Indian affairs and our State's Constitution *834 and laws. Six years and millions of dollars later, plaintiffs in effect seek to shut down the casino. Under these circumstances, the claims should have been dismissed because the Tribe is an indispensable party. Disregarding the severe prejudice to the Tribe, our colleagues now hold that the 1993 Compact is void and unenforceable on separation-of-powers grounds. In the absence of a dismissal, we believe that this appeal presents two constitutional issues: we find that Governor Cuomo did not violate the separation-of-powers doctrine by signing the 1993 Compact; the 1993 Compact does not contravene article I, § 9 of the New York Constitution. Thus, we respectfully dissent.

Indispensable Party
The question of whether an Indian tribe is an indispensable party in a state court suit involving a compact entered into pursuant to the Federal Indian Gaming Regulatory Act (IGRA) (25 USC § 2701 et seq.) is a matter of first impression for this Court.[1] Other states' appellate courts have considered this issue with mixed results.[2] No other state or federal court, *835 however, has grappled with indispensability in light of the extraordinary delay in bringing suit manifest here.[3]
A declaratory judgment does not require the Tribe's presence in order to afford complete relief (see Klostermann v Cuomo, 61 NY2d 525, 538-539 [1984]); however, as a practical matter, an adverse declaratory judgment will "inequitably affect" the absent Tribe. Thus, under the facts of this case, the Tribe is a necessary party under CPLR 1001 (a), as the majority agrees.
Because the Tribe is a necessary party whose sovereign immunity prevents joinder, the statutory factors in CPLR 1001 (b) must be weighed to determine whether the litigation should continue without the Tribe. The second factor (the prejudice to the Tribe if the claims proceed in its absence) and the third factor (whether and by whom this prejudice might have been or may be avoided in the future) are related and, in our view, dispositive. After all, the Appellate Division acknowledged that the Tribe would have a viable claim for dismissal on the basis of laches if it were a party (Saratoga County Chamber of Commerce v Pataki, 275 AD2d 145, 158 [2000] [Saratoga I]).
"Laches is defined as `such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.' * * * The essential element of this equitable defense is delay prejudicial to the opposing party" (Matter of Schulz v State of New York, 81 NY2d 336, 348 [1993], quoting Matter of Barabash, 31 NY2d 76, 81 [1972]). The 1993 Compact between the Tribe and the State was approved by the Tribe's chiefs on June 9, 1993 and by Governor Cuomo on October 15, 1993. The Assistant Secretary of the Interior, Indian Affairs, approved the 1993 Compact *836 under IGRA on December 4, 1993. The Tribe opened its $30 million casino on April 10, 1999, five years later.
These lawsuits, however, were not commenced until September 1999, nearly six years after the 1993 Compact became final. Plaintiffs have never offered an explanation for their neglect to sue immediately after the Governor signed the 1993 Compact or the federal government approved it. If plaintiffs had sued even reasonably promptly, the Tribe could have avoided or delayed substantial investments of time and money to develop the casino. At the very least, the Tribe would have been put on notice of plaintiffs' separation-of-powers allegations.
Moreover, the majority focuses its discussion of prejudice solely on whether or not "investors" (whoever they may be) have recouped their $30 million investment in four years (which, of course, is unknowable since the Tribe is not a party to this litigation). The majority ignores that the prejudice to the Tribe comprises more than dollars spent or profits made: our colleagues do not acknowledge the potential economic threat posed by this litigation to the casino's 400-odd employees and to the Tribe's long-term economic prospects.[4] The Tribe has dedicated 10 years to the pursuit of gambling as an economic development plan, and cannot now turn back the clock or "put[] genies back in their bottles" (Schulz, 81 NY2d at 348).
Nor did the Tribe execute the Compact or develop the casino in disregard of a known substantial separation-of-powers vulnerability. Rather, any such litigation risk that the Tribe might arguably have been aware of early on in 1993 was eclipsed by the Legislature's prompt and consistent support of the 1993 Compact.
Specifically, on July 7, 1993, both houses of the Legislature passed the bill that became chapter 264 of the Laws of 1993 upon the Governor's approval of it on July 13, 1993. This legislation granted the State Police and the Division of Criminal *837 Justice Services authority to undertake the responsibilities assigned to them by the 1993 Compact, which had been approved by the Tribe's chiefs in the month prior to this legislation's enactment. Section 1 of chapter 264 provides in its entirety as follows:
"In the event it is established that activity authorized under Public Law 100-497 [IGRA] shall be conducted in this state, notwithstanding any inconsistent provision of law, the New York state division of state police, on behalf of the New York state racing and wagering board, shall be granted access to the criminal history records of the division of criminal justice services, pursuant to subdivision 8-a of section 837 of the executive law, in connection with executing the responsibilities of the New York state racing and wagering board and the division of state police in regard to the regulation, oversight, licensing, or certification, including fingerprinting, criminal history record checks and background investigations of persons applying to engage in such activities. The division of criminal justice services shall submit a fingerprint card, along with the subject's processing fee, to the federal bureau of investigation for the purpose of conducting a criminal history search and returning a report thereon."
In addition, the Legislature for six consecutive years appropriated monies annually for the specific purpose of supporting oversight and regulatory activities assigned in the 1993 Compact to the Racing and Wagering Board and the State Police. These appropriations were made in anticipation of the opening of the Tribe's casino and were enacted by the Legislature even though the opening was delayed.[5]
Moreover, these appropriations were not opaque or tucked away in some obscure corner of the budget: they were included with appropriations for programs managed by the Racing and Wagering Board and the State Police and were separately denominated as "Special Revenue FundsOther, Miscellaneous *838 Special Revenue Fund  339, Regulation of Indian Gaming Account." Indeed, on July 12, 1993five days after both houses of the Legislature passed the bill that became chapter 264 of the Laws of 1993the First Deputy Director of the Division of the Budget wrote to both the Speaker of the Assembly and the Senate Majority Leader. He informed them, as required by law, of his intention to transfer monies from the special emergency appropriation in the already enacted fiscal year (FY) 1993-1994 budget to the Board and the State Police "to enable [these agencies] to engage in certain oversight and regulatory activities in relation to Class III gaming operations as set forth in gaming compacts between the [Mohawk and Oneida] Indian tribes and the State. These transfers are being made to the State Miscellaneous Special Revenue Fund, a Special Revenue FundsOther and will be reimbursed by the Indian tribes."
The majority downplays these appropriations. They might have had a point if the Racing and Wagering Board and the State Police had funded responsibilities assigned to them by the 1993 Compact under the authority of a more generic appropriation for agency operations. We wonder, however, how the Executive may ever be said to have acted without proper legislative authorization when carrying out activities for which the Legislature has earmarked funds.
The majority also relies heavily on a memorandum from Governor Cuomo's Counsel to establish that the Tribe had fair warning of the 1993 Compact's potential vulnerability. First, there is no reason to suppose (or, at least, no reason from the record) that the Tribe was contemporaneously aware of this memorandum, which is dated six days after the Tribe's chiefs approved the 1993 Compact. Second, the Governor's Counsel stated that while "the Governor has the legal authority under IGRA and state law to negotiate and sign an Indian gaming compact on the State's behalf," implementing legislation was needed for the Racing and Wagering Board to regulate Indian games; the State Police and the Division of Criminal Justice Services to conduct background investigations of casino employees and contractors; and the necessary appropriations.
The Legislature, in fact, enacted the kind of criminal justice legislation referred to by Governor's Counsel (i.e., chapter 264 of the Laws of 1993) and made the requisite appropriations. The Legislature has never deemed it necessary to adopt legislation to state specifically that the Racing and Wagering Board may regulate games of chance on Indian lands just as it already *839 regulates charitable games of chance throughout the state (see e.g. L 2001, ch 383). Even if we suppose (again, we have no reason to know from the record) that the Tribe was told during negotiations that specific legislative approval or ratification of any tribal-state gaming compact was required to safeguard against a separation-of-powers attack, the Governor obviously changed his view.[6] Instead, he submitted implementing legislation, which the Legislature promptly passed. In sum, the Tribe reasonably relied on the State's collective actions to conclude that the 1993 Compact was valid.
Finally, IGRA provides that tribes can only conduct class III gaming activities pursuant to a valid compact negotiated with the state in which the tribe is located (25 USC § 2710 [d] [1] [C]). Since the majority has declared the 1993 Compact void and unenforceable, the Tribe must either shut down the casino immediately[7] or conduct class III gaming in violation of IGRA and without any state regulatory oversight. The National Indian Gaming Commission has enforcement authority for IGRA, and can take action ranging from monetary penalties to forced closure of a casino where a tribe is in "substantial violation" of the statute (25 USC § 2713). The Commission did precisely this in United States v Santee Sioux Tribe of Neb. *840 (254 F3d 728, 731 [8th Cir 2001]), where the tribe accrued fines reduced to judgments totaling $1,182,000 and was forced to discontinue its class III gaming activities after a protracted legal battle (see also Pueblo of Santa Ana v Kelly, 932 F Supp 1284, 1290-1291 [D NM 1996] [noting United States Attorney's warning that continuation of gaming activities in absence of valid compact would subject tribes and pueblos to federal criminal sanctions and forfeiture of their gaming devices], affd 104 F3d 1546 [10th Cir 1997]). The Tribe should not be exposed to the risk of these significant adverse consequences in light of plaintiffs' prolonged delay in bringing these lawsuits.
A finding that the tribe is an indispensable party in these cases does not establish a per se rule that Indian tribes are indispensable parties whenever a claim is brought in state court involving Indian gaming. For instance, since only four months elapsed between the execution of the 1999 Amendment and the filing of plaintiffs' complaints, the same analysis might have yielded a different result had the 1999 Amendment presented a live controversy.
The Appellate Division concluded in Saratoga I that the constitutional nature of plaintiffs' claims outweighed any prejudice to the Tribe, and therefore the Tribe was not indispensable. The majority agrees, although in Schulz we held that a citizen-taxpayer's 11-month postenactment delay in challenging the constitutionality of state financing measures sufficiently disrupted expectations so as to foreclose judicial review. In light of the "profound destabilizing and prejudicial effects from delay" (81 NY2d at 347-348) caused by these vastly more belated lawsuits, we can only conclude that the Appellate Division abused its discretion as a matter of law when it allowed the suit to continue without the Tribe.

IGRA/Separation of Powers
Our analysis of the merits starts with the Constitution's implied separation-of-powers doctrine which "requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). The distinction between legislative (policymaking) and executive (policy implementing) functions is not black and white. Rather, "[i]t is only when the Executive acts inconsistently with the Legislature, or usurps its prerogatives, that the doctrine of separation is violated" (Clark v Cuomo, 66 NY2d 185, 189 [1985]; Matter of Broidrick v Lindsay, 39 NY2d 641 [1976]). While the majority *841 labels as critical policy choices various subjects related to the operation of gaming activities and includible in a tribal-state compact, what plaintiffs challenge in these cases is more fundamental; namely, the decision to authorize on-reservation class III Indian gaming.
Any discussion of what "critical policy choices" were available to the Legislature on this score starts with the recognition that Indian commerce is an area "under the exclusive control of the Federal Government" (Seminole Tribe of Fla. v Florida, 517 US 44, 72 [1996]). "The traditional notions of Indian sovereignty provide a crucial `backdrop' against which any assertion of state authority must be assessed" (Gaming Corp. of Am. v Dorsey & Whitney, 88 F3d 536, 547 [8th Cir 1996], citing White Mtn. Apache Tribe v Bracker, 448 US 136, 143 [1980]).
Faced with the question of whether a state could enforce its gambling laws on an Indian reservation, the United States Supreme Court in California v Cabazon Band of Mission Indians (480 US 202 [1987]) reiterated the long-established rule that "Indian tribes retain attributes of sovereignty over both their members and their territory, and that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States" (id. at 207 [internal quotation marks and citations omitted]). Moreover, "state laws may be applied to tribal Indians on their reservations [only] if Congress has expressly so provided" (id.).
In interpreting pre-IGRA law, the Supreme Court held that if a state merely "regulates" gambling (i.e., through its civil laws), tribes must be allowed to conduct gambling on their reservations free from the state's gambling regulations. If, however, a state "prohibits" gambling (i.e., through its criminal laws), tribes are forbidden from gambling and the state may enforce its laws.
The most controversial aspects of IGRA, which codified Cabazon with important modifications and "expressly preempt[ed] the field in the governance of gaming activities on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076; see Gaming Corp., 88 F3d at 544-549), cover class III gaming activities. These include pari-mutuel horse race wagering, lotteries, banking card games such as baccarat, chemin de fer and blackjack, electronic or electromechanical facsimiles of any game of *842 chance, and slot machines (25 USC § 2703 [7] [B]; [8]; 25 CFR 502.4 [c], [d]).[8]
IGRA continues the pro-Indian Cabazon holding by providing that class III gaming could be conducted in a "State that permits such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B] [emphasis added]). IGRA also, however, pays heed to states' apprehensions over unregulated Indian gaming by directing that a tribe can conduct class III gaming only pursuant to a "Tribal-State compact entered into by the Indian tribe and the State * * * that is in effect" (25 USC § 2710 [d ] [1] [C]).
Further, IGRA contains enforcement provisions to require that where a state permits class III gaming, it must negotiate in good faith with a tribe for a compact upon the tribe's request (see Mashantucket Pequot Tribe v State of Conn., 913 F2d 1024 [2d Cir 1990], cert denied 499 US 975 [1991]). If negotiations prove fruitless, the tribe can sue the state in federal court. If the state invokes sovereign immunity, the Secretary has authority to mediate the dispute and impose compact terms.[9]
In summary, IGRA mandates that, if a state allows any class III gaming by any person, a tribe may seek to conduct the same games on its lands. Moreover, the Second Circuit has firmly rejected the notion (unsuccessfully advanced by the State of Connecticut) that a state that allows only charities to engage in regulated casino-type gambling prohibits class III gaming activities for purposes of IGRA (id. at 1031-1032). States that allow charities to conduct class III gaming must negotiate in good faith with a tribe wishing to do the same.
New York has not outlawed all gambling for more than six decades. For better or worse, New Yorkers have adopted a public policy that permits considerable gambling, although regulated. This public policy is embodied in article I, § 9 of the Constitution, which contains statements purporting to ban gambling, butsignificantly, for purposes of IGRAexplicitly *843 authorizes four exceptions: (1) pari-mutuel betting on horse racing; (2) a state-operated lottery for education; (3) bingo for certain nonprofit organizations; and (4) "games of chance" for these same organizations. Games of chance are defined in the Constitution as follows:
"games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance." (Art I, § 9 [2].)
The Games of Chance Licensing Law (General Municipal Law art 9-A) empowers the Racing and Wagering Board to "[s]upervise the administration of the games of chance licensing law and to adopt, amend and repeal rules and regulations governing the issuance and amendment of licenses thereunder and the conducting of games under such licenses" (General Municipal Law § 188-a [1]). Section 186 (3) of the General Municipal Law defines "games of chance" to include and exclude specific types of games; and delegates to the Board the authority to add such "other specific games" to the list of approved games of chance as fall within the confines of what is allowed in the Constitution (i.e. games "in which prizes are awarded on the basis of a designated winning number or numbers, color or colors, symbol or symbols determined by chance"). To similar effect, 9 NYCRR 5620.1 lists Board-approved games, but also authorizes "any other game of chance which has been approved in writing by the board." (Subd [u].) Finally, article 16 of the Tax Law (the New York State Lottery for Education Law) authorizes the Division of the Lottery, among other things, to determine the type of lottery to be conducted (Tax Law § 1604 [a] [1]).
Plaintiffs do not challenge the constitutionality of any of the 26 specific games of chance listed in the 1993 Compact.[10] Plaintiffs do not contend that any of the games listed in the *844 1993 Compact are not among the numerous class III games that are already being conducted by nonprofit organizations and others in the state. Nor do they dispute the State's evidence that, as of January 12, 2001, the Racing and Wagering Board had issued games-of-chance identification numbers to 6,840 organizations. According to the Board's records for calendar year 1999, 2,125 authorized organizations were licensed to conduct bell jar games of chance. These organizations had a total handle of $298,598,154 from which a net profit of $51,646,037 resulted. With respect to other types of games of chance, $1,443,957 in net profits were raised by casino-style gaming from a handle of $3,011,913. According to the Division of the Lottery's Annual Report, in FY 2002-2003 the Division awarded $3.1 billion in prizes. In short, while regulated by the Racing and Wagering Board and the Division of the Lottery, gambling is commonplace in New York notwithstanding article I, § 9's general condemnation of it.
When Congress enacted IGRA pursuant to its plenary authority over Indian affairs, it legislated for all 50 states to allow sovereign nations (Indian tribes) to conduct class III gaming activities within states' borders. In this situation, the "critical policy decision" challenged by plaintiffsto authorize on-reservation class III Indian gamingderives from the unique interplay between IGRA and our State's Constitution and statutes. The Governor's recognition that class III Indian gaming is mandated in New York by federal law, given policy
did not constitute policymaking. In executing the 1993 Compact, which regulates the Tribe's conduct of class III gaming at its on-reservation casino, the Governor was merely implementing preexisting federal and state policy choices.
Whatever the case may be in other states, in New York, the Governor enjoys broad powers to enforce legislation and great flexibility in determining the methods of enforcement. For example, we have in recent years affirmed the Governor's authority to create entire new agencies with new duties for consumer advocacy based principally on a legislative policy as general as article 20 of the Executive Law, which empowers the Consumer Protection Board to "promote and encourage the protection of the legitimate interests of consumers within the state" (Bourquin, 85 NY2d at 785-786; see also Clark, 66 NY2d at 190 [statute providing that State Board of Elections "shall have the power and duty * * * to encourage the broadest possible voter participation in elections" sufficiently articulated *845 legislative policy to support Governor's creation of multi-agency voter-registration program]). The underlying legislative policy decisions here are more robust and detailed than were the legislative policy decisions implicated in Bourquin and Clark. On this record, we find no separation-of-powers violation.

Conclusion
The majority portrays the issues on this appeal as "fundamental and of immense public significance" (majority op at 814), which demand resolution despite the prejudice to the absent Tribe. The majority then stops short, leaving for another day "the question of the applicability of the State Constitution's antigambling provision." (Id. at 825.) Thus, our colleagues prolong constitutional uncertainty and create substantial hardships for the Tribe, not to mention for the casino's employees and the surrounding communities. Moreover, because of the nature of plaintiffs' claims, we do not see how the majority can sidestep deciding whether article I, § 9 prohibits class III gaming on Indian lands once the merits are reached.
In their briefs, during the course of two oral arguments and in several postargument submittals, plaintiffs continuously pressed their position that the class III gaming conducted at the casino under the 1993 Compact is prohibited by article I, § 9 of the New York State Constitution. Simply put, plaintiffs argue (and Judge Smith in his dissent agrees) that in light of article I, § 9's ban of "commercialized gambling," the Governor lacks any power to enter into a compact authorizing the Tribe to conduct Las Vegas-style gaming on Indian landswith or without the Legislature's approval or ratification. The State takes the opposite view.
The majority opines that, assuming the Legislature may constitutionally authorize the Governor to enter into a tribal-state compact for on-reservation class III gaming, the Legislature did not do so on the facts presented. In our view, the underlying constitutional issue is ripe for decision in this case once the merits have been reached. Further delay benefits no onenot those who may now seek legislative ratification of existing tribal-state compacts; not those who oppose Indian gaming.
For all the reasons given, we would reverse the order of the Appellate Division and dismiss both complaints.
Order modified, etc.
NOTES
[1] Plaintiffs additionally argue that allowing Las Vegas-style gaming violates the state constitutional prohibition against gambling (see NY Const, art I, § 9). For reasons that follow, we need not address that argument at this time.
[2] IGRA creates three classes of wagering games. Class I games are those "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations" (25 USC § 2703 [6]). Class II gaming includes bingo and card games (excluding banking card games) that are operated in accordance with state law limits on the amount of wagers and hours of operation (see 25 USC § 2703 [7]). Class III gaming includes all other forms of gambling (see 25 USC § 2703 [8]).
[3] Deputy Counsel Judith Hard signed the amendment on behalf of the Governor.
[4] See 25 USC § 2710 (d) (1) (C) (authorizing casino gambling on reservations where there is a Tribal-State compact "that is in effect"); Seminole Tribe of Fla. v Florida, 517 US 44, 47 (1996).
[5] See e.g. Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 (1991) (citing Schieffelin v Komfort, 212 NY 520, 530 [1914]; Doolittle v Supervisors of Broome County, 18 NY 155 [1858]); see also Wein v Comptroller of State of N.Y., 46 NY2d 394 (1979); Wein v Carey, 41 NY2d 498 (1977).
[6] In contrast to our approach, standing in federal courts rests on both constitutional (see US Const, art III, § 2 [1]) and prudential grounds. For a comprehensive treatment of standing in federal courts, see Erwin Chemerinsky, Federal Jurisdiction (at 56-114 [3d ed 1999]).
[7] See Krieger v Krieger, 25 NY2d 364 (1969); Calhoun v Millard, 121 NY 69 (1890); Guibord v Guibord, 2 AD2d 34, 36 (1st Dept 1956); 5 Weinstein-Korn-Miller, NY Civ Prac ¶ 3001.19, at XX-XXX-XX-XXX; Siegel, NY Prac § 36, at 45 (3d ed 1999) (citing Feldman v Metropolitan Life Ins. Co., 259 App Div 123 [1st Dept 1940]); id. § 438, at 711; 24C Carmody-Wait 2d, NY Prac § 147:129, at 140 (2001); Eager, The Declaratory Judgment Action § 9, at 41-44 (1971); Annotation, What Constitutes Laches Barring Right to Relief in Taxpayers' Action, 71 ALR2d 529 (1960); Annotation, Statute of Limitations or Doctrine of Laches in Relation to Declaratory Actions, 151 ALR 1076 (1944); see also Town of Cortlandt v Village of Peekskill, 281 NY 490, 498 (1939) (denying a laches defense to a challenge of a village charter, citing intervening legislative action as excusing the delay in bringing suit); American Dock Co. v City of New York, 174 Misc 813 (1940), affd 261 App Div 1063 (1st Dept 1941), affd 286 NY 658 (1941).
[8] In pertinent part, the memorandum reads as follows:

"The compacts assign largely to one existing state agencythe Racing and Wagering Boardthe state's `regulatory and oversight' power. The Board would (1) have access to all gaming facilities and business and accounting records; (2) receive daily inspection reports and patron complaints; (3) certify the Nation's gaming employees; (4) register all enterprises that will provide gaming services, supplies and equipment to the Nation; (5) meet four times a year with the Nation to discuss the regulatory and enforcement program; and (6) decide whether to allow new games or activities not included [sic] a compact. In order to carry out its new duties, the Board must adopt new rules and regulations.
"Only the Legislature, however, can direct the Board to undertake the new Indian gaming regulatory duties required by the compacts. Equine Practitioners Ass'n, Inc. v. New York State Racing and Wagering Board, 105 A.D.2d 215, 219 (1984), aff'd as modified on other grounds, 66 N.Y.2d 786 (1985) (`An administrative agency, as a creature of the Legislature, is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication.') And, only the Legislature can empower the Board to adopt the new rules and regulations that will be required in order for the Board to supervise Indian gaming. See, Beer Garden, Inc. v. New York State Liquor Authority, 79 N.Y.2d 266, 276 (1992) (a State agency's rule-making authority must be granted to it by the Legislature).
"Nothing in existing law confers on the Boardexpressly or by necessary implicationthe authority to supervise Indian gaming, including the authority to adopt the new rules and regulations that will be required. * * *
"We have long recognized the need for legislative action to implement the compacts. The Governor has consistently taken the position that the Legislature would have to authorize the State to implement compacts that require the State to regulate and oversee Indian gaming. That is why the Governor submitted a program bill in 1990 and 1991, seeking authority from the Legislature to negotiate and enter into compacts with any Indian tribe or nation. And, that is why, from the outset of negotiations with the St. Regis Mohawk Tribe in 1990, and with the Nation last summer, the State's negotiators told their Indian counterparts that legislative approval would be required before the State could enter into effective compacts. * * *
"The State cannot fulfill its regulatory responsibilities under the compacts without clear legislative authorization for the State agencies that must implement them. Absent such authorization, there is a substantial likelihood that the State's regulatory authority would be challenged * * *" (emphasis added).
[9] We recognize that other courts have held that dismissal is proper when an affected tribe declines to waive sovereign immunity (see e.g. American Greyhound Racing, Inc. v Hull, 305 F3d 1015, 1025 [9th Cir 2002]; Dawavendewa v Salt Riv. Project Agric. Improvement & Power Dist., 276 F3d 1150, 1162 [9th Cir 2002]; Manybeads v United States, 209 F3d 1164, 1166 [9th Cir 2000]; Enterprise Mgt. Consultants, Inc. v United States ex rel. Hodel, 883 F2d 890, 894 [10th Cir 1989]). Our review of the CPLR 1001 factors, informed by New York's policy disfavoring dismissal, convinces us that we should not follow those cases.
[10] For cases holding that an Indian tribe's absence due to sovereign immunity should not result in dismissal, see e.g. Kansas v United States (249 F3d 1213 [10th Cir 2001]); Sac & Fox Nation of Mo. v Norton (240 F3d 1250 [10th Cir 2001]); Artichoke Joe's v Norton (216 F Supp 2d 1084, 1090-1091 [ED Cal 2002]); Dairyland Greyhound Park, Inc. v McCallum (258 Wis 2d 210, 235, 655 NW2d 474, 487 [2002]).
[11] Mississippi allows its Governor the unilateral authority to negotiate and sign compacts (see Willis v Fordice, 850 F Supp 523 [SD Miss 1994], affd without op 55 F3d 633 [5th Cir 1995]). The Mississippi Constitution, however, vests residual powers with the Governor. By contrast, New York places residual policymaking responsibility with the Legislature.
[1] I agree with the majority that the plaintiffs have standing under State Finance Law § 123-b. I agree with the Appellate Division that several organizations, having alleged cognizable harm to their members, also have standing. As stated by the Appellate Division in its August 24, 2000 opinion: "New Yorkers for Constitutional Freedoms is a not-for-profit corporation representing approximately 1,650 churches and groups throughout the State whose individual members are opposed to casino gambling and support the constitutional operation of government. The Coalition Against Casino Gambling is a not-for-profit association whose individual members reside primarily in the Catskills and are opposed to casino gambling in that region. Similarly, the Western New York Coalition Against Casino Gambling is an unincorporated association representing religious organizations and grassroots citizens who oppose casino gambling in this State" (275 AD2d 145, 155-156 [2000]).
[2] Governor William Tryon took his oath of office on July 9, 1771.
[3] While the dissent cites Connecticut as support for its position that class III gaming should be permitted here, the Connecticut Constitution does not have antigambling provisions similar to those in the New York Constitution.
[4] Nothing requires this Court to await a lower court's view of a case before addressing that case.
[5] Under 18 USC § 1162 and 28 USC § 1360, Congress expressly granted six states the right to enforce their laws (both civil and criminal) over Indian tribes: Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin.
[6] The plaintiffs in both cases have addressed article I, § 9, arguing that it prohibits the gambling authorized by the 1993 Compact.
[7] All of those who negotiated the 1993 Compact, as well as those who passed budgetary provisions in its support, were well aware of the antigambling provisions of the New York State Constitution. The specific gambling permitted in article I, § 9 is in no way authority to permit commercial gambling.
[8] Following oral argument in this case, the Attorney General submitted to this Court a memorandum of understanding between the State of New York and the St. Regis Mohawk Tribe. Among the provisions of the memorandum are (1) a casino to be built in Sullivan County for class III gaming, (2) the prohibition of any slot machines by entities other than Indian tribes acting pursuant to Indian Gaming Regulatory Act in the geographic areas of Bronx, Delaware, Greene, Kings, New York, Orange, Queens, Richmond, Rockland, Sullivan and Ulster Counties and (3) payments to New York State of 20% of the proceeds from slot machines for the first four years of a compact and 25% for the period after four years.
[1] In cases involving public utilities on tribal lands, the Appellate Division has concluded that sovereign immunity requires dismissal if the underlying dispute implicates "the rights and powers" of the tribe (see Niagara Mohawk Power Corp. v Anderson, 258 AD2d 958, 959 [4th Dept 1999] [affirming dismissal of complaint because dispute involving electrical service on reservation implicates rights and powers of tribe, and any judgment in its absence would be incomplete], lv dismissed 93 NY2d 958 [1999]; Anderson v Town of Lewiston, 244 AD2d 965 [4th Dept 1997] [affirming dismissal of complaint and denial of motion to intervene because dispute involving water service on reservation implicates rights and powers of tribe, and any judgment in its absence would be incomplete], appeal dismissed 91 NY2d 920 [1998]; see also Seneca v Seneca, 293 AD2d 56 [4th Dept 2002] [affirming denial of dismissal of complaint because dispute over agreement between purchaser and seller for sale of gas station situated on reservation does not implicate rights and powers of tribe]).
[2] Compare State ex rel. Clark v Johnson (120 NM 562, 904 P2d 11 [1995] [tribe not indispensable under New Mexico law where writ of mandamus sought because performance of act to be compelled not dependent on tribe's will]) and Dairyland Greyhound Park, Inc. v McCallum (258 Wis 2d 210, 235, 655 NW2d 474, 487 [2002] [tribe not indispensable because otherwise "an important legal issue having significant public policy implications will evade resolution"], review denied 258 Wis 2d 110, 655 NW2d 129 [2002]) with State ex rel. Coll v Johnson (128 NM 154, 990 P2d 1277 [1999] [tribe indispensable in nonmandamus action seeking to halt Indian gaming in New Mexico subsequent to passage of legislation authorizing gaming compacts]); see also American Greyhound Racing, Inc. v Hull (305 F3d 1015 [9th Cir 2002] [tribe indispensable within meaning of federal rules where District Court was asked to decide if Arizona law permits Indian gaming]).
[3] See e.g. State ex rel. Clark v Johnson (petition filed less than two months after earliest compact executed); State ex rel. Blumenthal v Babbitt (899 F Supp 80 [D Conn 1995] [action to enjoin Secretary of Interior from accepting land into trust filed within days after Secretary's announcement of his intention to do so]); State ex rel. Coll v Johnson (by 1999 state's highest court considers challenge based on state gaming legislation enacted in 1997); Sac & Fox Nation of Mo. v Norton (240 F3d 1250 [10th Cir 2001] [action filed within 30 days to challenge Secretary of Interior's decision to acquire land in trust for tribe and to approve gaming activities on land]); Dairyland Greyhound Park, Inc. v McCallum (injunction sought to prevent governor from renewing compacts expiring in 2003 and 2004); American Greyhound Racing, Inc. v Hull (injunction sought to prevent governor from renegotiating or renewing compacts expiring in 2003).
[4] As of April 12, 2002, the Tribe employed 418 people at the casino (see ). The 1993 gaming compact between the state and amicus curiae Oneida Indian Nation has been challenged on grounds essentially identical to those here, and the state lost at the trial court for essentially the same reasons (Peterman v Pataki, Sup Ct, Oneida County, July 17, 2002, McCarthy, J., Index No. 99-533 [time to perfect appeal extended until July 16, 2003]). The Oneida opened the Turning Stone Casino near Utica, New York on July 20, 1993. By April 2002, the Turning Stone Casino was reported to employ 3,300 people and to have an annual payroll of $70 million (George Keller, Gaming "Transformed" Oneida Nation, Post-Standard [Syracuse], Apr. 18, 2002, Neighbors West, at 7).
[5] Three of the four legislator plaintiffs voted in favor of chapter 264. None of the legislator plaintiffs voted against budget bills including the specific appropriations for the Racing and Wagering Board for fiscal years 1994-1995, 1995-1996, 1996-1997 and 1999-2000. Only one of the legislator plaintiffs voted against these budget bills in the remaining fiscal years.
[6] Contemporaneous newspaper accountsof which the Tribe might have been awareindicate that Governor Cuomo wanted the Legislature's "response" to the compact that he was negotiating in 1993 with the Oneida Indian Nation before signing it, but that "[s]ome legislators said that [this was] an attempt to shift responsibility for a decision that could spark opposition"; and "[t]here are also questions as to whether the Legislature has any power to veto the compact" (James Dao, Accord Signed for a Casino in New York State, New York Times, Mar. 10, 1993, at B1). When Governor Cuomo subsequently signed a tribal-state compact with the Oneida, it was reported as "something of a reversal by Mr. Cuomo, who had said that the Legislature needed to authorize state regulation of the casino before he could sign a compact," but that "Republican leaders had said Mr. Cuomo was trying to spread political responsibility for gambling, and they refused to debate the issue until Mr. Cuomo signed the compact." (James Dao, Cuomo Signs Pact with Indians for Casino in Upstate New York, New York Times, Apr. 16, 1993, at A1.) It was further noted that "Mr. Cuomo plans to introduce legislation giving him the authority to spend $2.5 million for state police officers and inspectors for Indian casinos." (Id.) The spokesperson for the Senate Majority Leader was quoted as having said that "`We'll look at any legislation that he sends.'" (Id.) In fact, as noted in the text, the Legislature passed just such legislation.
[7] The Appellate Division did not anticipate this result: "It is important to note that plaintiffs do not seek to shut down the Tribe's casino located on the Akwesane [sic] reservation insofar as it is operated in accordance with the original compact" (Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 22 [2002] [Saratoga II]).
[8] We note that neither the 1993 Compact nor the 1999 Amendment authorized the Tribe to possess or operate slot machines at the casino.
[9] See 25 USC § 2710 (d) (7) (authorizing tribe to sue state in federal court where state fails to negotiate in good faith); Seminole Tribe of Fla. v Florida, 517 US 44 (1996) (invalidating IGRA, on Eleventh Amendment grounds, to the extent it allows tribes to sue states in federal court for a failure to negotiate in good faith); and 25 CFR part 291 (authorizing Secretary of the Interior to mediate and impose compacts if state invokes sovereign immunity); but see Florida v United States, Docket No. 4:99CV137-RH, ND Fla, filed Apr. 12, 1999 (challenging part 291).
[10] We express no opinion as to the constitutionality of any of the games included in the 1993 Compact. We note, however, that the question is not whether these games may be characterized as Las Vegas-style or commercialized gambling, but whether a particular game is a "game[] of chance" or "lottery" within the meanings of those terms in our Constitution and laws, and requires a detailed analysis of how each game is played (see e.g. Trump v Perlee, 228 AD2d 367 [1st Dept 1996] [electronic game, Quick Draw, offered in the State Lottery, contains all essential features of lottery and does not go beyond type of lottery contemplated by Constitution]).